840 So.2d 1050 (2003)
Christopher J. SCHRADER, Appellant,
v.
FLORIDA KEYS AQUEDUCT AUTHORITY, Appellee.
No. SC02-2166.
Supreme Court of Florida.
February 27, 2003.
*1051 Russell A. Yagel of Hershoff, Lupino & Mulick, LLP, Tavernier, FL, for Appellant.
Grace E. Dunlap, Kenneth A. Guckenberger, and Mark G. Lawson of Bryant, Miller and Olive, P.A., Tampa, FL; and Robert Feldman, General Counsel, Florida Keys Aqueduct Authority, Key West, FL, for Appellee.
Edward G. Guedes and Nina L. Boniske of Weiss, Serota, Helfman, Pastoriza & Guedes, P.A., Miami, FL, for City of Marathon, Florida, Amicus Curiae.
James T. Hendrick, County Attorney, Key West, FL, for Monroe County, Florida, Amicus Curiae.
WELLS, J.
Christopher J. Schrader appeals a circuit court judgment validating a proposed bond issue by the Florida Keys Aqueduct Authority (FKAA). We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. For the reasons discussed below, we affirm the judgment of the circuit court.

A. FACTS AND PROCEDURAL HISTORY
The FKAA was created by a special act of the Legislature in 1976. See ch. 76-441, Laws of Fla. The FKAA's original purpose was to obtain, supply, and distribute an adequate water supply in the Florida Keys, but a 1998 amendment expanded its powers to develop a sewage system as well. See ch. 98-519, Laws of Fla. (empowering FKAA to provide sewer service, issue bonds to develop a sewage system, and "to prescribe the specific type of wastewater treatment facility or measures required to be used within [its] boundaries"). In 1979, the Florida Keys were designated as an "area of critical state concern" pursuant to the Florida Keys *1052 Area Protection Act. See § 380.0552(3), Fla. Stat. (2002); ch. 79-73, § 6, Laws of Fla. The Florida Keys area of critical state concern contains all lands in Monroe County, with the exception of the City of Key West, federal properties, areas included within the Everglades National Park, and property owned by local, state, or federal governments. See id.; Fla. Admin. Code R. 28-29.002. Likewise, in 1990, the United States Congress designated the nearshore waters of the Florida Keys as a marine sanctuary. See Fla. Keys National Marine Sanctuary and Protection Act of 1990, Pub.L. No. 101-605, 104 Stat. 3089. Due to the significance of the Florida Keys, in 1998, Governor Buddy MacKay charged all relevant state and local agencies and governmental entities to coordinate with Monroe County to execute its Year 2010 Comprehensive Plan, which includes the development of a countywide sewage system. See Fla. Exec. Order No. 98-309 (Dec. 30, 1998). To assist in the implementation of that plan, Monroe County entered into a "Memorandum of Understanding" with the FKAA, whereby the FKAA would finance and operate the planned sewage system.
Prior to 1999, general law required any owner of an "onsite sewage treatment and disposal system," such as a septic tank or cesspit, to mandatorily connect to a publicly owned or investor-owned sewage system within 365 days of notice of the availability of such services. See § 381.00655(1)(a), Fla. Stat. (1997). However, "package sewage treatment facilities" (package plants)[1] were not included within the definition of "onsite sewage treatment and disposal systems" and thus not subject to mandatory connection. See § 381.0065(2)(i), Fla. Stat. (Supp.1998). In 1999, while the Florida Keys' sewage system was in the planning stages, the Legislature passed chapter 99-395, Laws of Florida, a bill relating to a number of wastewater laws. Section 4 of chapter 99-395 stated:
Section 4. Notwithstanding any provision of chapter 380, part I, to the contrary, a local government within the Florida Keys area of critical state concern may enact an ordinance that:
(1) Requires connection to a central sewerage system within 30 days of notice of availability of services; and
(2) Provides a definition of onsite sewage treatment and disposal systems that does not exclude package sewage treatment facilities if such facilities are in full compliance with all regulatory requirements and treat sewage to advance wastewater treatment standards or utilize effluent reuse as their primary method of effluent disposal.
The effect of section 4, therefore, was to provide local governments within the Florida Keys area of critical state concern with the authority to impose more stringent connection ordinances than elsewhereordinances requiring connections within thirty rather than 365 days and which are applicable to package plants.
On January 19, 2000, relying upon section 4 of chapter 99-395, Monroe County enacted a county ordinance that included package plants within its scope and required mandatory connections within thirty days of receipt of notification that a publicly owned or investor-owned sewage system is available. See Monroe County, Fla., Ordinance No. 04-2000 (Jan. 19, 2000).[2] No negative comments were filed *1053 during the hearing on that ordinance's enactment.
On October 18, 2000, the FKAA passed a "Master Resolution" authorizing the issuance of sewer revenue bonds in various series to finance projects in distinct localities as part of the larger goal of creating a countywide sewage system. See Fla. Keys Aqueduct Authority Resolution No. 00-20 (Oct. 18, 2000). Payment of each series of bonds would be secured by the pledging of the net revenues of the system in the form of fees paid by the users required to connect to the system.
On the same day that the master resolution was passed, the FKAA authorized the first series of bonds (the series 2000 bonds), in the amount of $4.5 million, to finance the first sewage system to be constructed in the Little Venice area. See Fla. Keys Aqueduct Authority Resolution No. 00-21 (Oct. 18, 2000). The FKAA filed a complaint in circuit court pursuant to chapter 75, Florida Statutes (2000), requesting validation of the bonds, and notice of the validation hearing was published in The Key West Citizen newspaper. Following the hearing, the court entered final judgment validating the bonds and held that "[t]he authorization and provisions of Sections 381.0065 and 381.00655, Florida Statutes, and Monroe County Ordinance 04-2000, which [require] the owners of onsite treatment and disposal systems to connect to available publiclyowned or privately-owned sewage systems, is legal, valid and binding." Fla. Keys Aqueduct Authority v. State, No. CA-K-00-1525, order at 4-5 (Fla. 16th Cir. Ct. order filed Dec. 22, 2000).
Keys Citizens for Responsible Government, Inc. (Citizens), an intervenor in the bond validation proceedings, appealed the circuit court's final judgment to this Court under its mandatory bond validation jurisdiction. Citizens did not contest the circuit court's validation of the bonds but, rather, urged that the circuit court's validation of the mandatory connection requirement went beyond the scope of the bond validation proceeding. Noting that the FKAA's bond resolution included a provision requiring mandatory connection in order to secure payment on the bonds with the connection fees and service charges, this Court held that the validity of the mandatory connection ordinance was not a collateral issue. Keys Citizens for Responsible Gov't, Inc. v. Fla. Keys Aqueduct Auth., 795 So.2d 940, 944-47 (Fla. 2001).
After the series 2000 bonds were issued for the Little Venice area, the FKAA began work on its next project. On July 12, 2002, the FKAA authorized the second bond series (the series 2003 bonds), in the amount of $83 million, issued for the financing of a sewage system to be constructed in the City of Marathon. See Fla. Keys Aqueduct Authority Resolution No. 02-24 (July 12, 2002). Around the same time, the FKAA and the City of Marathon adopted mandatory connection ordinances (the connection ordinances) substantially similar to those of Monroe County. See Fla. Keys Aqueduct Authority Rules & Regulation 48.301.006 (Mar. 27, 2002); City of Marathon, Fla., Ordinance No. 02-07-12 (July 17, 2002). No negative comments were filed regarding these requirements at either of the two hearings held regarding the city ordinance or at any of three hearings held regarding the FKAA's rules and regulations.
On July 24, 2002, the FKAA filed a complaint in circuit court pursuant to chapter 75, Florida Statutes (2002), requesting validation of the series 2003 *1054 bonds. The complaint also requested that the circuit court validate and confirm that the FKAA's service area is wholly encompassed within the Florida Keys area of critical state concern; chapter 99-395, Laws of Florida, is a general law applicable in that area; and the connection ordinances are legal, valid, and enforceable. Notice of the validation hearing was published in The Key West Citizen newspaper, and appellant Schrader appeared at the hearing held on August 22, 2002.[3] Testimonial evidence was presented regarding the bonds to be validated and the challenged connection ordinances.[4] Schrader did not oppose validation but challenged the relief requested by the FKAA regarding chapter 99-395 and the connection ordinances. He asserted that because section 4 of chapter 99-395 pertains only to local governments within the Florida Keys area of critical state concern, it is a special law unconstitutionally passed as a general law in violation of article III, section 10 of the Florida Constitution. He further argued that the connection ordinances are unenforceable because their provisions regarding package plants are based solely on the authority granted by section 4. In response, the FKAA argued that section 4 of chapter 99-395 is a valid general law because it concerns an area of critical state concern that affects industries of statewide importance.
The circuit court entered final judgment validating the bonds and specifically held that (1) the FKAA has the power to require all necessary property owners within its geographic jurisdiction to utilize its sewer services pursuant to the FKAA and city ordinances; (2) the FKAA is authorized to covenant with bond holders not to permit the operations of competing sewer service facilities pursuant to sections 381.0065 and 381.00655, Florida Statutes (2002), and the FKAA and city ordinances, which are legal, valid, and binding; and (3) the provisions of section 4 of chapter 99-395, Laws of Florida, pertain to matters of statewide concern, are applicable in an area of critical state concern, and were properly enacted as a general law. Fla. Keys Aqueduct Auth. v. State, No. CA-K-02-826, order at 4, 5, 7 (Fla. 16th Cir. Ct. order filed Aug. 26, 2002).
Schrader has appealed the final judgment to this Court under our mandatory bond validation jurisdiction. See art. V, § 3(b)(2), Fla. Const. Both parties maintain their arguments as presented in the circuit court below. The FKAA filed a *1055 motion to expedite the appeal and to waive oral argument, urging that the timing of the project is critical in order to receive certain state funding. This Court granted the FKAA's motion and accepted the case without oral argument.

B. ANALYSIS
The challenge that Schrader maintains before this Court concerns the constitutionality of the statute in respect to it being a special rather than a general law. As we stated in Keys Citizens for Responsible Government, Inc. v. Florida Keys Aqueduct Authority:
Additionally, at the bond validation hearing in the instant case the trial court heard evidence that mandatory connection is required both by Florida statute and by Monroe County ordinance, and that both the economic feasibility of the central sewer system and the public purpose for this project are predicated on the hook-up of all property in the area of operation. Thus, the mandatory connection was an appropriate issue for this bond validation proceeding.
795 So.2d at 947. Similarly, in this case the trial court considered an issue concerning the provision of the statute authorizing the mandatory connection, which we likewise consider here.
Schrader states that the issue is whether a state law that authorizes local governments in Monroe County, and only Monroe County, to pass wastewater laws more restrictive than those provided for under general law is a special law. We have held that whether a law is a special or general law is a pure legal question subject to de novo review. See City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002); Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 881 (Fla.1983). The legal analysis of this issue begins with article III, section 10 of the Florida Constitution, which states, "No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law." The Florida Constitution defines special law as "a special or local law." Art. X, § 12(g), Fla. Const. This Court has further defined "special law" and "general law" as follows:
[A] special law is one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal; a local law is one relating to, or designed to operate only in, a specifically indicated part of the state, or one that purports to operate within classified territory when classification is not permissible or the classification adopted is illegal.
A general law operates universally throughout the state, or uniformly upon subjects as they may exist throughout the state, or uniformly within permissible classifications by population of counties or otherwise, or is a law relating to a state function or instrumentality.
State ex rel. Landis v. Harris, 120 Fla. 555, 163 So. 237, 240 (1934) (citations omitted).
A law relating to subdivisions of the state or to subjects, persons, or things as a class is a valid general law if the classification is based upon proper differences which are inherent in or peculiar to the class. Sanford-Orlando Kennel Club, Inc., 434 So.2d at 881. If particular physical conditions exist in only a portion of the state, enactments with reference thereto nonetheless may be general laws. See State ex rel. Landis, 163 So. at 240. So long as a law materially affects the people of this state, it need not have universal *1056 application to be a general law. See Cantwell v. St. Petersburg Port Auth., 155 Fla. 651, 21 So.2d 139, 140 (1945) (law authorizing Railroad Commission to grant franchises to construct means of transportation across waters bordering or connected with Gulf of Mexico is not special law); St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Fla., Inc., 421 So.2d 1067, 1069 (Fla.1982) (law establishing Greater St. Johns River Basin as part of larger statutory plan to create water management districts statewide is not special law). This Court has upheld as legally valid general laws legislation that facially appeared to affect only a limited geographic area of the state but which had a primary purpose contemplating an important and necessary state function and an actual impact far exceeding the limited geographic area identified by its terms. See Dep't of Bus. Regulation v. Classic Mile, Inc., 541 So.2d 1155, 1159 (Fla.1989) (citing Cantwell, St. Johns River Water Mgmt. Dist. and State v. Fla. State Tpk. Auth., 80 So.2d 337 (Fla.1955) (law requiring construction of turnpike through counties between Broward and St. Lucie is general law given Legislature's intent to eventually construct longer traffic artery affecting travel statewide)).
In sum, if a law utilizes a classification that is geographical in its terms but the purpose of the statute is one of statewide importance and impact, and the classification is reasonably related to the law's purpose, it is a valid general law. See State v. Leavins, 599 So.2d 1326, 1336-37 (Fla. 1st DCA 1992) (law prohibiting use of mechanized dredge or rake for oyster harvesting in Apalachicola Bay is valid general law because shellfishing industry has statewide importance and impact and Apalachicola Bay is area of critical state concern that produces ninety percent of state's commercial oyster harvest). In this instance, the section of the statute being challenged is part of a general statutory scheme to environmentally protect areas which have been legislatively designated as being of "critical state concern."
We distinguish this law from the law which we had before us in Department of Business Regulation v. Classic Mile, Inc., In that case, we found that the classification was a guise for a law which applied to authorize certain wagering only in Marion County. We reached a similar conclusion in approving the First District Court of Appeal's decision in Ocala Breeders' Sales Co., Inc. v. Florida Gaming Centers, Inc., 731 So.2d 21 (Fla. 1st DCA 1999), affirmed, 793 So.2d 899 (Fla.2001). More recently, we concluded that a statute which utilized a population classification of those municipalities of more than 300,000 citizens as of April 1, 1999, was an impermissible special law. See McGrath, 824 So.2d at 151. However, we do not conclude that the legislative designation of "critical state concern" in this statute is a "guise" for the purpose of adopting a special law as a general law. Rather, we accept that the primary purpose of this statute is one of statewide importance and impact. It provides to local governments in the area designated as being of "critical state concern" the authority to enact stricter regulations regarding the treatment of wastewater in order to protect a vital natural resource of the state: the nearshore waters of the Florida Keys. This natural resource is one of statewide importance, as evidenced by not only the designation of the area as one of critical state concern but also by its direct relationship with industries of statewide importance such as tourism and seafood. Its actual impact, therefore, far exceeds the limited geographic area of Monroe County. Section 4 is thus a "law relating to a state function," the protection of an area of critical state concern. As in St. Johns River *1057 Water Management District, section 4 must be considered in the larger context of a comprehensive state plan.

C. CONCLUSION
Because section 4 of chapter 99-395, Laws of Florida, applies to an area of critical state concern, its purpose is one of statewide importance, and that purpose is rationally related to the designation of the Florida Keys as an area of critical state concern, we reject Schrader's constitutional challenge to that statute.
Accordingly, we affirm the judgment below validating the sewage system revenue bonds to be issued by the FKAA.
It is so ordered.
ANSTEAD, C.J., and PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, J., concurs in part and dissents in part with an opinion.
LEWIS, J., concurring in part and dissenting in part.
I concur to the extent that the Court affirms the circuit court's order validating the proposed bond issue; however, I must again voice my concern that this Court is continuing to further expand the scope of judicial bond validation review to include ancillary matters not properly resolved in summary proceedings. As I stated in my separate opinion in Keys Citizens for Responsible Government, Inc. v. Florida Keys Aqueduct Authority, 795 So.2d 940 (Fla.2001), the scope of this Court's review of summary bond validation proceedings has always been properly limited to consideration of (1) whether the public body had authority to issue the bonds, (2) whether the purpose of the obligation is legal, and (3) whether the bond issuance complies with the requirements of the law. See id. at 950 (Lewis, J., concurring in part and dissenting in part) (citing DeSha v. City of Waldo, 444 So.2d 16 (Fla.1984), and McCoy Restaurants, Inc. v. City of Orlando, 392 So.2d 252 (Fla.1980)).
Particularly troubling to me is the majority's willingness to engage in an analysis of the wisdom and "economic feasibility" of the project which is to be funded by the revenue bonds subject to summary validation proceedings. See majority op. at 1055. Clearly, exploration of the relative merits of a particular project falls far outside the parameters of the three-pronged examination which has, until today's decision, limited the scope of the judiciary's review in bond proceedings. When the majority's decision is taken in conjunction with Keys Citizens for Responsible Government, Inc. v. Florida Keys Aqueduct Authority, it is clear that previously established limitations on the scope of summary bond validation proceedings are no longer applicable. Thus, trial courts and Florida citizens must be aware that the relative merits and wisdom of the projects financed by revenue bonds are now issues which are fully litigable and open to debate in bond validation proceedings.
In my view, matters relating to section 4 of chapter 99-395 and other local ordinances are issues which are and have traditionally been considered to be collateral to the validity of the FKAA bonds, and thus they are not properly before a court in bond validation proceedings. See State v. City of Miami, 379 So.2d 651 (Fla.1980); State v. Sarasota County, 372 So.2d 1115 (Fla.1979); State v. City of Miami, 103 So.2d 185 (Fla.1958). Therefore, I do not join in any portion of the majority opinion which expands the scope of summary judicial review in bond validation proceedings.
NOTES
[1] Package plants are small, premanufactured sewage treatment facilities typically used to treat wastewater in small communities or on individual properties.
[2] This ordinance was later amended, but those sections relevant to the instant discussion remained unchanged. See Monroe County, Fla., Ordinance No. 017-2002 (July 17, 2002).
[3] The State was represented by the Office of the State Attorney and did not oppose validation. A second citizen also appeared to argue that Key Largo is outside the FKAA's jurisdiction and did not contest the bonds.
[4] Testimonial evidence indicated the following. The purpose of the mandatory connection ordinances is two-fold: (1) to address environmental issues more quickly and better by compelling speedier connections by all to an advanced wastewater treatment facility; and (2) to ensure that there will be sufficient revenue to repay the bonds. Regarding environmental issues, while "advanced wastewater facilities" such as the new facilities to be constructed under the FKAA's master resolution remove ninety percent of the nutrients that degrade water quality, package plants provide only "secondary treatment," removing few nutrients. Thus, the plan envisions the pumping of all wastewater through the new facilities, thereby bypassing treatment in package plants. In Marathon, this would mean that approximately seventy package plants, which currently treat about one-third of the wastewater produced in Marathon, would be required to connect to the new facilities. Regarding issues of funding, the current financing structure of the series 2003 bonds is based in part upon mandatory connections by package plants and, thus, the revenue from user fees associated with those connections. Without package plant connections, user fees would be collected for the treatment of only two-thirds of the wastewater produced in Marathon.