912 So.2d 616 (2005)
STATE of Florida, DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, DIVISION OF PARI-MUTUEL WAGERING, Appellant,
v.
GULFSTREAM PARK RACING ASSOCIATION, INC., Appellee.
Hartman-Tyner, Inc., West Flagler Associates Ltd., The Aragon Group, Inc., Summersport Enterprises, LLLP, and Florida Gaming Centers, Inc., Appellants,
v.
Gulfstream Park Racing Association, Inc., Appellee.
Nos. 1D04-4094, 1D04-3819.
District Court of Appeal of Florida, First District.
August 31, 2005.
Rehearing Denied October 21, 2005.
*618 Joseph M. Helton, Jr., Assistant General Counsel, Department of Business and Professional Regulation, Tallahassee, for Appellant Department of Business and Professional Regulation.
Harold F.X. Purnell of Rutledge, Ecenia, Purnell & Hoffman, P.A., Tallahassee, for Appellants Hartman-Tyner, Inc.; West Flagler Associates Ltd.; The Aragon Group, Inc.; Summersport Enterprises, LLLP; and Florida Gaming Centers, Inc.
Cynthia S. Tunnicliff, Marc W. Dunbar and William H. Hughes III of Pennington, Moore, Wilkinson, Bell & Dunbar, P.A., Tallahassee, for Appellee.
PADOVANO, J.
This is an appeal from a final judgment declaring section 550.615(6), Florida Statutes, unconstitutional. Among other things, this statute prohibits the holder of a thoroughbred horse racing permit from engaging in intertrack wagering in an area of the state where there are at least three horse racing permit holders within twenty-five miles of each other. The trial court determined that the statute is a special law and declared it invalid on the ground that it was not enacted according to the applicable procedures in Article III, Section 10 of the Florida Constitution. We affirm.
The conditions that trigger the prohibition in section 550.615(6) against intertrack wagering apply only in one small geographic area straddling the border between Dade County and Broward County. From the evidence in the record, we conclude that there is no reasonable possibility that these conditions will ever exist in any other part of the state. Moreover, we conclude that the decision to single out a limited class of thoroughbred permit holders from the privilege of engaging in intertrack wagering was an arbitrary decision *619 that does not promote any valid public policy. For these reasons, we hold that section 550.615(6), Florida Statutes is a special law enacted in the guise of a general law.
The controversy arose in April of 2002, when the Department of Business and Professional Regulation filed an administrative complaint against the Gulfstream Racing Association, Inc., alleging that it had engaged in an unauthorized exchange of intertrack wagering signals. Gulfstream had been conducting horse races at its racetrack in Hallandale and selling the live broadcasts of the races to Pompano Park Racing, a harness racing track in Pompano Beach. The Department maintained that Gulfstream was prohibited by section 550.615(6) from selling its broadcasts within its market area, because it held a thoroughbred racing permit and because it was within twenty-five miles of at least two other horse race permit holders.
Gulfstream filed an action for a declaratory judgment in the circuit court challenging the validity of section 550.615(6) on a number of constitutional grounds. Among the arguments was a claim that the statute is a special law and that it was not enacted according to the state constitutional requirements that apply to special laws. The trial court determined that the resolution of this claim would require consideration of the evidence relating to the potential applicability of the statute. Gulfstream then presented testimony and other evidence at a final evidentiary hearing. No evidence was presented on behalf of the Department or by any of the other racetracks, which had by then intervened in the case on the side of the Department.
Louis Cross, III, an expert cartographer, testified that the only location in Florida where there are three or more horse race permit holders within twenty-five miles of one another is the area in South Florida that includes Gulfstream. Given the present requirements for the issuance of new pari-mutuel wagering permits, Mr. Cross concluded that the conditions in section 550.615(6) would not come into existence in any other part of the state. He conceded, however, that it would be possible to replicate the proximity requirements of section 550.615(6) in Key West, if someone were to obtain a thoroughbred horse racing permit there, if two others were to obtain quarter horse racing permits there, and if all three permit holders were located within twenty-five miles of each other.
Subject to an exception for permits to race quarter horses, the parties agree that a new horse racing permit could not be issued for a location within one hundred miles of any existing pari-mutuel wagering facility. A quarter horse permit is the only kind of permit that is not subject to a proximity requirement.
Douglas Donn, the chief executive officer of Gulfstream, testified that some of the horse racing tracks hold quarter horse permits but that none of them currently race quarter horses, because it is not a profitable enterprise. He said that there had not been a quarter horse race in Florida at any horse racing track for at least six years, and he pointed out that if quarter horse racing is not profitable for multiple permit holders who can pay the fixed expenses of operating a track with revenues from other kinds of races, it would be very unlikely that anyone would build a new facility solely for the purpose of racing quarter horses.
Although he conceded that a new thoroughbred track could be built in Key West without violating the one-hundred-mile proximity requirement, Mr. Donn nevertheless believed that a new track in that location would never be subject to the *620 prohibition against intertrack wagering. The prohibition would come into play only if two other horse racing tracks were built in the area, and both would have to be quarter horse tracks. Mr. Donn stated the view that this could not happen. He explained that a quarter horse track requires at least one hundred twenty-five acres of land, and, even assuming it would be economically feasible to have three horse racing tracks within twenty-five miles of each other in Key West, there is simply not enough land available.
In support of the cartographer's opinion, Mr. Donn testified that Gulfstream is located in the only area of Florida where a thoroughbred permit holder is unable to engage in intertrack wagering. Tampa Bay Downs holds a thoroughbred racing permit but is free to engage in intertrack wagering, because it is not within twenty-five miles of two other horse racing tracks. From Mr. Donn's perspective, the law permits Tampa Bay Downs to do what it expressly forbids Gulfstream from doing.
The final witness for Gulfstream was Dr. Richard Thalheimer, an economist with special expertise in the pari-mutuel wagering industry. Dr. Thalheimer testified that it would be in the state's financial interest to allow intertrack wagering at Gulfstream. He explained that the tax revenues that would be earned on the races broadcast in Gulfstream's local area would exceed the revenues lost by the decline in attendance at other pari-mutuel wagering facilities. The net gain to the state, in Dr. Thalheimer's view, would be approximately $3 million per year.
Based on these facts, the trial court concluded that section 550.615(6) is a special law that could only be applied in the area where Gulfstream is located. The final judgment states that "there was at the time of enactment, during the entire time since enactment, and is now, precisely one area of the state where there are three or more horse race permit holders within twenty-five miles of each other." The court noted that neither party had attempted to explain the purpose of section 550.615(6), and concluded from this omission that the "most plausible explanation in the testimony was that there was no public policy that led to the twenty-five mile intertrack border."
In the trial court's assessment, the prohibition against intertrack wagering at Gulfstream was simply a privilege Gulfstream was required to give up for various other benefits. This, the court concluded, was exactly the sort of local interest that should not be regulated by a general law. Based on these findings and conclusions, the trial court held that section 550.615(6), Florida Statutes, was unconstitutional as a special law enacted in the guise of a general law. The Department and the intervenors then filed a timely appeal to this court to seek review.
As a general principle, a decision on the constitutionality of a statute is a question of law and is therefore reviewed de novo. See In re Estate of Caldwell, 247 So.2d 1 (Fla.1971); Ocala Breeders' Sales Co., Inc. v. Florida Gaming Ctrs., Inc., 731 So.2d 21 (Fla. 1st DCA 1999), aff'd, 793 So.2d 899 (Fla.2001). In this case, however, the final judgment has both factual and legal components. Whether the statute could be applied to permit holders in other areas of the state is, at least in part, an issue of fact. We accept the trial court's findings of fact and apply the de novo standard of review only to the legal conclusion drawn from the facts.
The ultimate issue presented by the appeal is whether section 550.615(6) is a general law or a special law. If the statute is a special law, as Gulfstream contends, it is unconstitutional on the ground that it was *621 not enacted by the procedure in Article III, Section 10 of the Florida Constitution. This section states that "[n]o special law shall be passed unless notice of intention to seek enactment thereof has been published. . . or [unless] the law is conditioned to become effective on the vote of the electors of the area affected." Art. III, § 10, Fla. Const. The Department and the intervenors concede that these procedures were not followed. They contend that the legislature was not required to give notice or allow for a local election, because the statute was properly enacted as a general law.
At the outset, then, we must consider the essential differences between special laws and general laws. Article 10, Section 12(g) of the Florida Constitution states that a special law is "a special law or a local law." This definition incorporates two related but slightly different concepts. A law may be regarded as a special law because it regulates a class of persons or things when classification is not permissible, or because it applies only in a particular geographic location when there is no valid basis to distinguish that location from others. See State ex rel. Landis v. Harris, 120 Fla. 555, 163 So. 237 (1934). In contrast, a general law operates universally throughout the state or uniformly within a permissible classification. See Dep't of Bus. Reg. v. Classic Mile, Inc., 541 So.2d 1155 (Fla.1989).
Whether a statute is a special law depends on its potential applicability to others who may come within the regulated class. See City of Miami v. McGrath, 824 So.2d 143 (Fla.2002). A statute that applies to a limited class of entities or in a limited area at the time it is enacted may nevertheless qualify as a general law if it could be applied to other entities or in other areas in the future. Indeed, a statute may be a general law even though it was enacted for the benefit of a single business entity or a single geographic area. See Dept. of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879 (Fla.1983); Summersport Enterprises, Ltd. v. Pari-Mutuel Comm'n, 493 So.2d 1085 (Fla. 1st DCA 1986). The critical question is not one of legislative intent; rather, it is whether the class regulated by the statute is open.
By these principles, we conclude that section 550.615(6), Florida Statutes (1996), is a special law. The statute prohibits thoroughbred permit holders from engaging in intertrack wagering in "any area of the state where there are three or more horse race permit holders within twenty-five miles of each other." These conditions exist only in the area where Gulfstream is located, and they will never exist in other parts of the state in the future.
When Gulfstream Park opened for business, the restrictions on the minimum distance between pari-mutuel wagering facilities were much more lenient, and that is why it was possible for Gulfstream to be one of three horse racing tracks within a twenty-five mile radius of each other. However, these conditions do not exist at present, because the other sections of the Pari-Mutuel Wagering Act now prohibit the issuance of permits for horse racing tracks this close together. Section 550.054(2) states in part, "[A]n application may not be considered, nor may a permit be issued by the division or be voted upon in any county, to conduct horse races, harness horse races, or dograces at a location within one hundred miles of an existing pari-mutuel facility. . . ." § 550.054(2), Fla. Stat. (2004).
If a horse racing permit cannot be issued at a location within one hundred miles of an existing pari-mutuel wagering *622 facility, then it is safe to say that there will not be a new area in Florida that would have three or more horse racing permit holders within twenty-five miles of each other. Because new horse racing tracks would have to be at least one hundred miles apart, the conditions that trigger the statutory prohibition against intertrack wagering in section 550.615(6) will not be replicated.
Section 550.054 was enacted in 1992 and has been in effect continuously since then to prohibit the issuance of a permit to conduct horse races within one hundred miles of an existing pari-mutuel wagering facility. However, the prohibition in section 550.615(6) against intertrack wagering in areas where there are three or more horse racing permit holders within twenty-five miles of each other was enacted subsequently in 1996. The timing of these two laws leads us to conclude that the purpose of the twenty-five-mile limit in section 550.615(6) was merely to describe the area where Gulfstream is located. It was, even at that time, the only area that could fit the description.
The Department and the intervenors argue that it is still possible to have an area in Florida where there would be three horse race permit holders within a twenty-five mile radius of one another. They point out that the Pari-Mutuel Wagering Act contains a special provision exempting quarter horse permit holders from the one-hundred mile limit that applies to other horse race permit holders. See § 550.334(4), Fla. Stat. It is at least conceivable, they argue, that someone could obtain a permit to hold quarter horse races near enough to a thoroughbred permit holder and at least one other horse racing permit holder to trigger the prohibition against intertrack wagering.
This brings us to the most difficult part of the case. We acknowledge that the class is not closed for the purpose of this analysis merely because it is unlikely that it will include anyone else. However, we could not say that the class is open merely because there is a theoretical possibility that some day it might include someone else. That approach would undermine the constitutional requirements for the adoption of special laws. We conclude from the applicable precedents that the proper standard is whether there is a reasonable possibility that the class will include others.
The common thread running through the cases holding that a class remains open is that they all present situations in which it is reasonable to believe that the class will include others in the future. In fact, the supreme court used the term "reasonable" in the leading case of Biscayne Kennel Club, Inc. v. Florida State Racing Commission, 165 So.2d 762 (Fla.1964) to support its conclusion that the statute at issue was not a special law. The statute allowed a racing permit holder having daily revenues below a certain amount to conduct harness racing in any county that had previously approved pari-mutuel wagering. At the time of its enactment, the statute applied in only one county, but the supreme court held that the class remained open. In support of this holding the court observed that "a number of Florida counties may by future referendum acquire racing establishments, and some may reasonably be expected to come within the class covered." Id. at 764 (emphasis added).
It follows from the holding in Biscayne Kennel Club that the question is not whether it is imaginable or theoretically possible that the law might be applied to others, but whether it is reasonable to expect that it will. Other decisions implicitly stand for the same proposition. For example, in City of Coral Gables v. Crandon, 157 Fla. 71, 25 So.2d 1 (Fla.1946), the *623 court held that a statute requiring the creation of a water management district in any county having a population greater than 260,000 was not a special law. At the time of its enactment, the statute applied only in Dade County. Citing the population trends as reflected in the most recent census, the court noted that there were other Florida counties that were rapidly approaching the limit set by the statute and concluded that the class was open.
The evidence presented in this case plainly shows that there is no reasonable possibility that section 550.615(6) will be applied in another area of the state. Someone would have to obtain a thoroughbred permit in Key West, which would then be subject to the prohibition against intertrack wagering in the statute only if two other stand-alone quarter horse permits were issued in Key West, and then only if all three horse racing tracks were located within twenty-five miles of each other. Alternatively, the Department would have to issue a stand-alone quarter horse permit in a twenty-five mile area that includes an existing thoroughbred permit holder and at least one other horse racing permit holder.
These hypotheticals do not show that section 550.615(6) has any real potential to apply to others. They are highly contrived situations that demonstrate no more than a technical possibility. The evidence in the record supports the trial court's conclusion that quarter horse racing is a thing of the past. Apparently, quarter horse races are so unprofitable that they are no longer held anywhere in the state, not even by those who hold multiple horse racing permits and can afford to pay the fixed expenses of operating their race tracks with the revenues earned from other kinds of horse races.
Applying the rationale of Biscayne Kennel Club and Crandon, we conclude that the class created by section 550.615(6) is closed. The statute applies only in a limited part of the state and therefore it should have been enacted under the procedures that apply to special laws. We are unable to uphold the statute as a general law of limited applicability because the classification it makes "bear[s] no reasonable relation to the subject regulated." McGrath, 824 So.2d at 149, quoting Walker v. Pendarvis, 132 So.2d 186, 192-193 (Fla.1961); see also Sanford-Orlando Kennel Club, 434 So.2d at 881; Carter v. Norman, 38 So.2d 30 (Fla.1948); Art. III, § 11(b), Fla. Const. (providing that a general law of local applicability may be valid if the statutory classification is "reasonably related to the subject of the law").
All things considered, we are simply unable to say that the classification made in the statute is reasonable. The state has a legitimate interest in pari-mutuel wagering, but the evidence shows that no legitimate state interest is promoted by prohibiting thoroughbred permit holders in one limited area of the state from engaging in intertrack wagering. In fact, the undisputed testimony shows that the prohibition is against the state's interest. Dr. Thalheimer testified that it results in a net loss to the state of approximately $3 million per year.
The trial court noted in the final judgment that the parties had failed to explain the basis for the statute's classification and that its purpose was not otherwise apparent from the legislative history. The subject came up again during the oral argument before this court, and again the parties were unable to offer any reasonable basis for the classification in the law. It was suggested that the prohibition against intertrack wagering might help to ensure good attendance at the live events held at other pari-mutuel wagering facilities in the area, but Dr. Thalheimer factored *624 that point into his conclusion that the prohibition results in a net loss to the state. Moreover, the parties have not explained why it would be important to protect live attendance at nearby facilities only in this one area of the state.
For these reasons, we hold that section 550.615(6) is unconstitutional as a special law enacted in the guise of a general law. The statute cannot be upheld as a general law despite its limited applicability because it creates a purely arbitrary classification. We agree with the trial court that there was no reasonable basis for prohibiting thoroughbred permit holders from engaging in intertrack wagering only in one small part of the state. Because this holding is dispositive, we need not address any of the other arguments presented by the parties.
Affirmed.
BARFIELD and POLSTON, JJ., concur.