ANSTEAD, J.
We have on appeal a decision of a district court of appeal declaring invalid a state statute. State Dep’t of Bus. & Prof'l Reg. v. Gulfstream Park Racing Ass’n, Inc., 912 So.2d 616 (Fla. 1st DCA 2005). We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. The issue before this Court is whether section 550.615(6), Florida Statutes (Supp.1996), is unconstitutional as a special law enacted in the guise of a general law and without compliance with the specific requirements for the enactment of special laws. We affirm and approve the holding of the district court that this statute is an unconstitutional special law because there was no reasonable possibility that the classification used in the statute would ever apply to another area of the state after the statute was amended in 1996.[1]
FACTS AND PROCEDURAL HISTORY
In April 2002, the Department of Business and Professional Regulation (“the Department”) filed an administrative complaint against Gulfstream Park Racing Association, Inc. (“Gulfstream”), alleging that it had engaged in an unauthorized exchange of intertrack wagering signals. Gulfstream had been conducting horse races at its racetrack in Hallandale and selling the live broadcasts of the races to Pompano Park Racing, a harness racing track in Pompano Beach. The Department contended that Gulfstream was in violation of section 550.615(6), which prohibits Gulfstream from selling its broadcasts within its market area, because it holds a thoroughbred racing permit and is within twenty-five miles of at least two other horse race permitholders.
Gulfstream filed an action for a declaratory judgment in the circuit court, challenging the provisions of section 550.615(6) on a number of constitutional grounds. Among the grounds was a claim that the statute was a special law and that it was not enacted according to the state constitutional requirements that apply to special laws. After taking evidence to determine the parties and areas of the state affected by the statute, the trial court concluded that section 550.615(6) was unconstitutional as a special law enacted in the guise of a general law:
The plaintiff presented testimony sufficient to establish, and I now find, that there was at the time of enactment, during the entire time since enactment and is now precisely one “area of the state where there are three or more horserace permitholders within 25 miles of each other.” The only area of the state where there are or were three horserace permitholders within 25 miles of each other is the area of Dade and Broward Counties that includes Gulf-stream, Calder, Pompano Park and Hialeah Park.
Section 550.615(6) was enacted in 96-364, Laws of Florida. There is no suggestion within the enacting legislation of any purpose of the 25 mile intertrack border other than the obvious one — to carve . out the Dade-Broward market area as it existed when the statute was enacted.
Although certainly not dispositive, this conclusion is consistent with the parties’ description of the negotiated legislative process that preceded enactment of the statute. Neither party offered any legislative history to explain some public *805 purpose served by limiting the inter-track wager authorization within the 25 mile border. The most plausible explanation in the testimony was that there was no public policy that led to the 25 mile intertrack border. The restrictions against intertrack wagering at Gulf-stream were simply what Gulfstream was required to give up for various other benefits. This sort of local interest horsetrading is specifically prohibited by Article III Section 10.
[[Image here]]
The preponderance of the evidence and Florida’s legislative scheme supports the conclusion that the classification created by section 550.615(6) was constitutionally closed at the time of its enactment and remains so. The legislature imposed the statutory geographic restrictions on permitholders. Moreover, the legislature decreed that additional permits may only become “effectual” upon affirmative vote of the county electorate. Thus, for the intertrack wagering restriction to expand the legislature must repeal the geographic permit limitations, an entity must apply for a permit and meet all of the rather daunting requirements, and the electorate of the county must approve the permit. It is unsurprising under these circumstances that section 505.615(6) has since its enactment, applied to precisely one 25 mile area of the state.
The classification was closed at the time of enactment and remains closed. To conclude otherwise would be to reduce Article III Section 10 to mere semantics. Section 550.615(6) applies only and can apply only to the Dade-Bro-ward market area and so constitutes a special law in violation of Article III, Section 10 of the Florida Constitution.
The Department and intervenors vigorously argue the high standard that must be satisfied by a party seeking to overturn a statute. The only doubt injected in this matter comes from the statute’s use of the word “any.” It implies that there might be more than one. But the pari-mutuel statutes themselves, together with conditions as they exist now and as they existed at the time of enactment leads to the conclusion that the classification, “three or more horse-race permitholders within 25 miles of each other,” was and is closed in the constitutional sense.
On appeal, the First District Court of Appeal affirmed the trial court’s decision that section 550.615(6) violates article III, section 10 of the Florida Constitution, which states, “No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law ... [unless the law] is conditioned to become effective on the vote of the electors of the area affected.” Gulfstream, 912 So.2d at 618.[2]
In its opinion, the First District did its own constitutional analysis as to whether the classification created in section 550.615(6) was limited to one geographic area or remained open:
When Gulfstream Park opened for business, the restrictions on the minimum distance between pari-mutuel wagering facilities were much more lenient, and that is why it was possible for Gulf-stream to be one of three horse racing tracks within a twenty-five mile radius of each other. However, these conditions do not exist at present, because the other sections of the Pari-Mutuel Wagering Act now prohibit the issuance of *806 permits for horse racing tracks this close together. Section 550.054(2) states in part, “[A]n application may not be considered, nor may a permit be issued by the division or be voted upon in any county, to conduct horse races, harness horse races, or dograces at a location within one hundred miles of an existing pari-mutuel facility....” § 550.054(2), Fla. Stat. (2004).
If a horse racing permit cannot be issued at a location within one hundred miles of an existing pari-mutuel wagering facility, then it is safe to say that there will not be a new area in Florida that would have three or more horse racing permit holders within twenty-five miles of each other. Because new horse racing tracks would have to be at least one hundred miles apart, the conditions that trigger the statutory prohibition against intertrack wagering in section 550.615(6) will not be replicated.
Section 550.054 was enacted in 1992 and has been in effect continuously since then to prohibit the issuance of a permit to conduct horse races within one hundred miles of an existing pari-mutuel wagering facility. However, the prohibition in section 550.615(6) against inter-track wagering in areas where there are three or more horse racing permit holders within twenty-five miles of each other was enacted subsequently in 1996. The timing of these two laws leads us to conclude that the purpose of the twenty-five-mile limit in section 550.615(6) was merely to describe the area where Gulf-stream is located. It was, even at that time, the only area that could fit the description.
[[Image here]]
The evidence presented in this case plainly shows that there is no reasonable possibility that section 550.615(6) will be applied in another area of the state. Someone would have to obtain a thoroughbred permit in Key West, which would then be subject to the prohibition against intertrack wagering in the statute only if two other stand-alone quarter horse permits were issued in Key West, and then only if all three horse racing tracks were located within twenty-five miles of each other. Alternatively, the Department would have to issue a standalone quarter horse permit in a twenty-five mile area that includes an existing thoroughbred permit holder and at least one other horse racing permit holder.
These hypotheticals do not show that section 550.615(6) has any real potential to apply to others. They are highly contrived situations that demonstrate no more than a technical possibility. The evidence in the record supports the trial court’s conclusion that quarter horse racing is a thing of the past. Apparently, quarter horse races are so unprofitable that they are no longer held anywhere in the state, not even by those who hold multiple horse racing permits and can afford to pay the fixed expenses of operating their race tracks with the revenues earned from other kinds of horse races.
Gulfstream, 912 So.2d at 621-23. The Department and Hartman-Tyner, Inc, et. al. (“Intervenors”) now appeal the First District’s conclusion that section 550.615(6) is unconstitutional.
ANALYSIS
The question of whether a law is a special or general law is a legal question subject to de novo review. Schrader v. Fla. Keys Aqueduct Auth., 840 So.2d 1050, 1055 (Fla.2003). When a court has declared a state statute unconstitutional, the reviewing court must begin the process with a presumption that the statute is valid. Dep’t of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 881 (Fla.1983).
*807 The Florida Constitution defines “special law” as “a special or local law.” Art. X, § 12(g), Fla. Const. Furthermore, this Court has defined “special law” and “general law” as:
[A] special law is one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal; a local law is one relating to, or designed to operate only in, a specifically indicated part of the state, or one that purports to operate within classified territory when classification is not permissible or the classification adopted is illegal.
A general law operates universally throughout the state, or uniformly upon subjects as they may exist throughout the state, or uniformly within permissible classifications by population of counties or otherwise, or is a law relating to a state function or instrumentality.
State ex rel. Landis v. Harris, 120 Fla. 555, 163 So. 237, 240 (Fla.1934) (citations omitted). We have applied these definitions to a wide variety of statutes that were enacted by the Legislature as general laws, but were challenged as special laws. We discuss only a few to illustrate the application of the constitutional restrictions on the passage of special or local laws.
In City of Miami v. McGrath, 824 So.2d 143 (Fla.2002), this Court addressed a statute which authorized only certain municipalities — those with populations of more than 300,000 on April 1, 1999 — to impose a parking tax. Id. at 146. We concluded that the statute was a special law because its express terms concerning population on a date certain limited its application and excluded any other municipalities from joining the class in the future. Id. at 151. This was a straightforward case because it could easily be determined, based upon available population statistics, that the class was closed and there was no possibility of the statute ever applying to another municipality.
On the other hand, in City of Coral Gables v. Grandon, 157 Fla. 71, 25 So.2d 1 (1946), this Court held that a statute relating to the creation of a water management district in any county having a population greater than 260,000 was not a special law. Id. at 2-3. This statute was a general law because there were other Florida counties that were rapidly approaching the limit set by the statute. Id. at 2. Thus, it was reasonably possible that the statute would apply in another area of the state.
In Department of Business Regulation v. Classic Mile, Inc., 541 So.2d 1155 (Fla.1989), we addressed a statute that authorized the receipt and display of simulcast thoroughbred horse racing, and pari-mutu-el wagering thereon, at licensed facilities. Id. at 1157. The statute provided criteria for establishing a class of counties in which a facility could be licensed, including requiring the existence of two unused quarter horse racing permits before January 1, 1987. Id. All parties in that case agreed that Marion County was the sole county that would ever fall within the statutorily designated class of counties eligible for licensure of a facility. Id. Therefore, we held that the statute was an unconstitutional special law, despite the Legislature’s treatment of the law as a general law, because it applied only to one county and there was no possibility that it would ever apply to any other county. Id. at 1158. We explained that “a statutory classification scheme incapable of generic application to members of a class, and fixed so as to preclude additional parties from satisfying the requirements for inclusion within the statutory classification at some future point in time, indicates an arbitrary classi *808 fication scheme in the context of parimutuel legislation.” Id. at 1158 n. 4 (citing Sanford-Orlando, 434 So.2d at 882; Biscayne Kennel Club, Inc. v. Fla. State Racing Comm’n, 165 So.2d 762, 763 (Fla.1964)).
In Sanford-Orlando, we confronted a statute that permitted harness racing tracks to be converted to dog racing tracks. 434 So.2d at 880. At the time the legislation was passed, it only applied to one track. Id. at 882. However, we stated that “[n]either does it matter that, once the law was passed, Seminole was the only track to benefit from it. The controlling-point is that even though this class did in fact apply to only one track, it is open and has the potential of applying to other tracks.” Id. We concluded that because the statute could be applied to future tracks, it was a constitutional general law, and we emphasized that “[t]he fact that matters is that the classification is potentially open to other tracks.” Id.
Finally, in Biscayne Kennel Club, this Court addressed a statute that allowed a racing permitholder having daily revenues below a certain amount to conduct harness racing in any county that had previously approved pari-mutuel wagering. 165 So.2d at 763-64. However, at the time of its enactment, the statute applied in only one county. Id. at 764. Nevertheless, this Court held that the class remained open because “a number of Florida counties may by future referendum acquire racing establishments, and some may reasonably be expected to come within the class covered.” Id.
THIS APPEAL
Apparent from an analysis of our prior cases on special laws is that while we must give great deference to actions of the Legislature, we must also recognize that under the provisions of article III, section 10 of the Florida Constitution, the Legislature is constitutionally barred from passing general laws that impact only specific parties or areas of the state unless constitutional requirements are met. Nevertheless, we acknowledge that a statute that appears to apply to one situation or area at the time of enactment may still be considered a general law if it could be applied to other situations or areas in the future.
The parties herein are in agreement that the statute when enacted and at the time of the trial court proceedings only applied to a limited area of the state and limited entities located therein. They differ only as to whether the class of operations covered by the statute remains open, and the standard for determining the statute’s potential for future application. Appellants assert that the district court applied an erroneous legal standard in considering whether the statute could apply to other entities or other areas of the state by adding a “reasonableness” condition to the evaluation of that possibility:
The Department and the intervenors argue that it is still possible to have an area in Florida where there would be three horse race permit holders within a twenty-five mile radius of one another. They point out that the Pari-Mutuel Wagering Act contains a special provision exempting quarter horse permit holders from the one-hundred mile limit that applies to other horse race permit holders. See § 550.334(4), Fla. Stat. It is at least conceivable, they argue, that someone could obtain a permit to hold quarter horse races near enough to a thoroughbred permit holder and at least one other horse racing permit holder to trigger the prohibition against inter-track wagering.
This brings us to the most difficult part of the case. We acknowledge that the class is not closed for the purpose of this analysis merely because it is unlike *809 ly that it will include anyone else. However, we could not say that the class is open merely because there is a theoretical possibility that some day it might include someone else. That approach would undermine the constitutional requirements for the adoption of special laws. We conclude from the applicable precedents that the proper standard is whether there is a reasonable possibility that the class will include others.
Gulfstream, 912 So.2d at 622 (emphasis supplied). We conclude that a review of our case law and the underlying purpose behind the constitutional restrictions contained in article III, section 10, supports the reasonableness standard used by the First District and its application to this case.
In essence, we must choose between a wholly speculative evaluation of the possibility of the future application of a statute as advanced by the appellants and the practical reasonableness standard articulated by the district court. While our own case law has been largely silent on this issue, an examination of the analysis applied in each case implicitly suggests that we ourselves were applying a reasonableness and realistic possibility standard in assessing a statute’s potential future operation. Nowhere in any of our decisions have we indicated that a wholly speculative or unreasonable potential would satisfy the constitutional mandate of article III, section 10.
Moreover, in Biscayne Kennel Club, we ourselves utilized a reasonableness standard when we concluded that “a number of Florida counties may by future referendum acquire racing establishments, and some may reasonably be expected to come within the class covered.” 165 So.2d at 764 (emphasis supplied). We conclude now that we made explicit in that opinion what was implicit in our prior decisions, namely that any determination of possible future applications of a statute must be done by a realistic and reasonable assessment. Otherwise, such an assessment would essentially be standardless, a situation we do not believe to be consistent with judicial review and enforcement of article III, section 10.
Further, we also agree with the observations of both the trial court and the district court on this issue. The trial court explained its determination that the class upon which the statute operated was realistically closed and that “[t]o conclude otherwise would be to reduce article III section 10 to mere semantics.” The district court further explained that “we could not say that the class is open merely because there is a theoretical possibility that some day it might include someone else. That approach would undermine the constitutional requirements for the adoption of special laws.” Gulfstream, 912 So.2d at 622.
CONCLUSION
Section 550.615(6) prohibits thoroughbred permitholders from engaging in in-tertrack wagering in “any area of the state where there are three or more horserace permitholders within 25 miles of each other.” Both the trial court and the district court concluded that at the time the statute was amended in 1996, these conditions existed only in the area where Gulfstream was located, and there was no reasonable possibility that they would ever exist in another part of the state. We concur in the findings of the trial court and the conclusion of the district court. As a result, we conclude that section 550.615(6) is an unconstitutional special law enacted in the guise of a general law. Accordingly, we affirm the First District’s decision below.
It is so ordered.
*810 LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, C.J., specially concurs with an opinion, in which BELL, J., concurs.

. We decline to address the issue of whether Gulfstream was required to exhaust its administrative remedies before challenging the constitutionality of section 550.615(6).

. The Department and Intervenors concede that these procedures were not followed. They contend that the Legislature was not required to give notice or allow for a local election because the statute was properly enacted as a general law.