# Supreme Court of Florida

_____

No. SC19-1464
_____

**FLORIDA DEPARTMENT OF HEALTH, etc., et al.,**
Petitioners,

vs.

**FLORIGROWN, LLC, etc., et al.,**
Respondents.

May 27, 2021
**CORRECTED OPINION**

PER CURIAM.

We have for review the First District Court of Appeal's decision in _Florida Department of Health v. Florigrown, LLC_ (_Florigrown I_), No. 1D18-4471, 2019 WL 2943329 (Fla. 1st DCA July 9, 2019). The First District partially upheld a temporary injunction that prohibits enforcement of certain statutory provisions relating to the regulation of medical marijuana treatment centers (MMTCs). We have jurisdiction because the district court passed upon and certified a question to this Court as one of great public importance.

*Fla. Dep't of Health v. Florigrown* (*Florigrown II*), No. 1D18-4471, 2019 WL 4019919, at \*1 (Fla. 1st DCA Aug. 27, 2019); *see* art. V, § 3(b)(4), Fla. Const.

The temporary injunction was entered during a pending lawsuit filed by Florigrown, LLC, and Voice of Freedom, Inc. (collectively, Florigrown), against the Florida Department of Health (Department) and other state actors. Florigrown's lawsuit includes several constitutional challenges to section 381.986(8), Florida Statutes (2017). Specifically, Florigrown challenges two provisions as inconsistent with the recent medical marijuana amendment to the Florida Constitution, article X, section 29 (the Amendment). One of those provisions mandates that MMTCs use a vertically integrated supply chain, *see* § 381.986(8)(e), and the other places statutory caps on the number of MMTC licenses available to authorize entities to participate in the medical marijuana industry, *see* § 381.986(8)(a). Florigrown also challenges three provisions of section 381.986(8) as special laws granting privileges to private corporations, contrary to article III, section 11(a)(12) of the Florida Constitution. *See* § 381.986(8)(a)1., 2.a., 3. The trial court agreed

with Florigrown as to each argument and entered a temporary injunction.

In its decision partially upholding the injunction, the First District certified the following as a question of great public importance:

> WHETHER [FLORIGROWN HAS] DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF [ITS] CLAIMS THAT THE STATUTORY REQUIREMENTS OF VERTICAL INTEGRATION AND CAPS ON THE NUMBER OF MEDICAL MARIJUANA TREATMENT CENTER LICENSES AS SET FORTH IN SECTION 381.986(8), FLORIDA STATUTES, ARE IN DIRECT CONFLICT WITH ARTICLE X, SECTION 29, OF THE FLORIDA CONSTITUTION.

*Florigrown II*, 2019 WL 4019919, at *1.

Having considered the certified question together with Florigrown's special-law-based challenge to section 381.986(8), we hold that Florigrown has not demonstrated a substantial likelihood of success on the merits of any of its constitutional claims. Accordingly, and as is fully explained below, we quash the First District's decision.

## BACKGROUND

In November 2016, the people of Florida amended our state constitution to mandate the development of a carefully regulated

system for providing access to marijuana for certain patients suffering from debilitating medical conditions. Art. X, § 29, Fla. Const. The Amendment requires the Department to "issue reasonable regulations necessary for the implementation and enforcement of" its provisions, for the purpose of "ensur[ing] the availability and safe use of medical marijuana by qualifying patients." *Id.* § 29(d). At the same time, the Amendment contemplates that the Legislature may "enact[] laws consistent with" its provisions. *Id.* § 29(e).

Among the regulations the Department is required to issue are "[p]rocedures for the registration of MMTCs that include procedures for the issuance, renewal, suspension and revocation of registration, and standards to ensure proper security, record keeping, testing, labeling, inspection, and safety." *Id.* § 29(d)(1)c. The Amendment required the Department to issue these procedures within six months of the Amendment's effective date, January 3, 2017, and to begin registering MMTCs within nine months of that date. *Id.* § 29(d)(1) (2).

The Amendment provides state-law immunity from criminal or civil liability for actions taken by an MMTC in compliance with the

Amendment and the Department's regulations. *Id.* § 29(a)(3).[1] It

defines "MMTC" as follows:

> an entity that acquires, cultivates, possesses, processes . . . , transfers, transports, sells, distributes, dispenses, or administers marijuana, products containing marijuana, related supplies, or educational materials to qualifying patients or their caregivers and is registered by the Department.

Art. X, § 29(b)(5), Fla. Const.

This proceeding is based on a challenge to a statute enacted in

light of the Amendment and to the Department's deference to that

statute. Because the statute builds on prior statutory law, a review

of the pre-Amendment law addressing the medical use of marijuana

in Florida will provide context for some of the challenged provisions.

In 2014, the Legislature enacted the "Compassionate Medical

Cannabis Act of 2014." Ch. 2014-157, § 1, Laws of Fla. This act

created section 381.986, which allowed the medical use of "low-THC

cannabis" for certain patients diagnosed with cancer or a "physical

medical condition that chronically produces symptoms of seizures

---

1. Marijuana is still an illegal controlled substance under federal law, with no exception for medicinal use. 21 U.S.C. §§ 812(b)(1), 812(c), 841(a), 844(a); *Gonzales v. Raich*, 545 U.S. 1, 14, 27, 29 (2005).

or severe and persistent muscle spasms." § 381.986(2), Fla. Stat. (2014). This statute required such patients to be listed in the state registry and to obtain their low-THC cannabis from "dispensing organizations" regulated by the state. *Id.* § 381.986(1)(a), (b)-(d), (5), (7)(a). Under the 2014 law, "dispensing organization" was defined as "an organization approved by the department to cultivate, process, and dispense low-THC cannabis pursuant to this section." *Id.* § 381.986(1)(a). The Department was required to "[a]uthorize the establishment of five dispensing organizations to ensure reasonable statewide accessibility and availability" of low-THC cannabis for qualifying patients. *Id.* § 381.986(5)(b). One applicant was to be chosen from each of five regions in Florida. *Id.*

The Legislature expanded Florida's cannabis law in 2016 to allow certain qualified patients to obtain full-potency "medical cannabis" from dispensing organizations and to authorize the approval of three additional dispensing organizations once 250,000 qualified patients were registered. § 381.986(1)(f), (5)(c), Fla. Stat. (2016); ch. 2016-123, § 1, Laws of Fla. To qualify for medical cannabis, rather than low-THC cannabis, qualified patients had to be terminally ill and expected to die within a year. §§ 499.0295(2),

381.986(2), Fla. Stat. (2016). In contrast, the Amendment allows the use of full-potency marijuana for medical purposes for qualified patients with "debilitating medical condition[s]," a term defined to include a more expansive set of conditions than the prior law and not limited to patients who are terminally ill. Art. X, § 29(b)(1), Fla. Const.

In June 2017, the Legislature passed and the Governor signed Senate Bill 8-A, which amended section 381.986 in light of the Amendment. Ch. 2017-232, § 3, Laws of Fla. The portions of that law that are most pertinent to this proceeding are the following:

(8) MEDICAL MARIJUANA TREATMENT CENTERS.—

(a) The department shall license medical marijuana treatment centers to ensure reasonable statewide accessibility and availability as necessary for qualified patients registered in the medical marijuana use registry and who are issued physician certification under this section.

1. As soon as practicable, but no later than July 3, 2017, the department shall license as a medical marijuana treatment center any entity that holds an active, unrestricted license to cultivate, process, transport, and dispense low-THC cannabis, medical cannabis, and cannabis delivery devices, under former s. 381.986, Florida Statutes 2016, before July 1, 2017, and which meets the requirements of this section. . . .

2. The department shall license as medical marijuana treatment centers 10 applicants that meet the requirements of this section, under the following parameters:

a. As soon as practicable, but no later than August 1, 2017, the department shall license any applicant whose application was reviewed, evaluated, and scored by the department and which was denied a dispensing organization license by the department under former s. 381.986, Florida Statutes 2014; which had one or more administrative or judicial challenges pending as of January 1, 2017, or had a final ranking within one point of the highest final ranking in its region under former s. 381.986, Florida Statutes 2014; which meets the requirements of this section; and which provides documentation to the department that it has the existing infrastructure and technical and technological ability to begin cultivating marijuana within 30 days after registration as a medical marijuana treatment center.

. . . .

c. As soon as practicable, but no later than October 3, 2017, the department shall license applicants that meet the requirements of this section in sufficient numbers to result in 10 total licenses issued under this subparagraph, while accounting for the number of licenses issued under sub-subparagraphs a. and b.

3. For up to two of the licenses issued under subparagraph 2., the department shall give preference to applicants that demonstrate in their applications that they own one or more facilities that are, or were, used for the canning, concentrating, or otherwise processing of citrus fruit or citrus molasses and will use or convert the facility or facilities for the processing of marijuana.

4. Within 6 months after registration of 100,000 active qualified patients in the medical marijuana use registry, the department shall license four additional

medical marijuana treatment centers that meet the requirements of this section. Thereafter, the department shall license four medical marijuana treatment centers within 6 months after the registration of each additional 100,000 active qualified patients in the medical marijuana use registry that meet the requirement of this section.

. . . .

(e) A licensed medical marijuana treatment center shall cultivate, process, transport, and dispense marijuana for medical use. A licensed medical marijuana treatment center may not contract for services directly related to the cultivation, processing, and dispensing of marijuana or marijuana delivery devices, except that a medical marijuana treatment center licensed pursuant to subparagraph (a)1. may contract with a single entity for the cultivation, processing, transporting, and dispensing of marijuana and marijuana delivery devices.

§ 381.986 (8) (a), (e), Fla. Stat. (2017).

As noted at the outset, Florigrown's lawsuit challenges some of these provisions as inconsistent with the Amendment and others as invalid special laws granting privileges to private corporations. Several months after filing the lawsuit, Florigrown moved for a temporary injunction prohibiting further registration or licensure of MMTCs under section 381.986(8) and requiring the Department to immediately register MMTCs, including Florigrown in particular.

The trial court held an evidentiary hearing on Florigrown's motion in July 2018. At that time, there were fourteen MMTCs

- 9 -

registered in Florida, and the Department had not issued MMTC licenses to any entities that had not applied to be dispensing organizations under the former law. In fact, there was no rule in place for registering MMTCs that had not applied to be dispensing organizations. However, the Department was pursuing rulemaking under section 381.986 that would allow new entities to apply for MMTC licensure.

A Department representative testified that, once rulemaking concluded, seven MMTC licenses would be available "to any company, including a company such as Florigrown," except that one such license would have to go to a member of a class that Florigrown is not part of (and which is defined in section 381.986(8)(a)2.b., a provision not specifically at issue in this proceeding), and two such licenses would be subject to the citrus preference.

The trial court initially denied Florigrown's motion without prejudice. The trial court recognized that, to be entitled to a temporary injunction, Florigrown needed to show (1) that it has a substantial likelihood of success on the merits, (2) that there is no adequate remedy at law, (3) that it would suffer irreparable harm in

the absence of a temporary injunction, and (4) that the injunction would serve the public interest. The trial court concluded that Florigrown had demonstrated a substantial likelihood of success on the merits of its constitutional claims—specifically, that the vertical-integration requirement and statutory caps conflict with the Amendment and that parts of the licensure scheme are invalid as special laws granting privileges to private corporations. The trial court also found that Florigrown has no adequate remedy at law for these violations and for the Department's refusal to register Florigrown outside the statutory scheme. However, the trial court further found that Florigrown had failed to show that the denial of the temporary injunction would cause irreparable harm or that granting the temporary injunction would serve the public interest.

Regarding the irreparable-harm inquiry, the trial court observed that, without the temporary injunction, Florigrown would still "have the ability to apply and compete for one of the remaining available MMTC licenses."

As for the public interest, the trial court observed that "[a]n injunction should preserve the status quo during the pendency of the case" and then concluded, "The requested injunction at this

- 11 -

time would substantially alter the status quo by halting the Department's existing process and procedures for the issuance of MMTC licenses as well as the rulemaking currently underway to initiate the application process."

The trial court explained that the denial of the temporary injunction was without prejudice because "[t]he passing of more time may alter" the findings concerning irreparable harm and the public interest. It scheduled a case management conference for two months in the future to reassess those findings.

Shortly before the conference, Florigrown renewed its motion for a temporary injunction, alleging that the Department had failed to take "any meaningful action in recognition of" the trial court's order. At the conference, Florigrown's counsel advised that the Department had filed a proposed rule to implement portions of section 381.986 that the court had found substantially likely to be unconstitutional on the merits. In addition, Florigrown's counsel advised that the Department had announced at a public hearing that it intended to move forward with rulemaking under section 381.986. Finding that the Department had failed to change course since entry of the earlier order, the trial court entered a temporary

injunction requiring the Department to immediately stop registering or licensing MMTCs under section 381.986; to begin registering MMTCs under the constitutional language alone within two weeks; and specifically to register Florigrown as an MMTC within two weeks unless the Department could show before that deadline that "such registration would result in unsafe use of medical marijuana by qualifying patients." The trial court found irreparable harm because the Department had not taken action in response to its prior order. The trial court determined that the injunction was in the public interest because the Amendment had received the approval of over seventy percent of voters and because compliance with the Amendment is required to ensure the availability and safe use of medical marijuana.

The trial court's order was stayed, and the Department appealed to the First District. The First District agreed with the trial court that Florigrown had demonstrated a substantial likelihood of success as to two grounds of unconstitutionality—namely, the statutory requirements of vertical integration and caps on the number of MMTC licenses—and further agreed that all the requirements for a temporary injunction were met. *Florigrown I,*

2019 WL 2943329, at *2-*5. As a result, over a dissent, the First District upheld the injunction "to the extent it requires the Department to consider Florigrown's request for licensure without applying the portions of the statutory scheme [that the First District's] opinion identifies as being [preliminarily] unconstitutional." *Id.* at *1. The First District did not find it in the public interest for the Department "to register MMTCs pursuant to a preliminary injunction without applying other regulations to uphold the safety of the public" and, therefore, explained that it was affirming "that portion of the injunction that precludes [the Department] from enforcing the [preliminarily] unconstitutional provisions but allows the Department a reasonable period of time to exercise its duties under the constitutional amendment." *Id.* at *5. Later, on the Department's motion, the First District certified the language quoted at the beginning of this opinion—pertaining to Florigrown's likelihood of success on the merits of its challenges to the vertical-integration requirement and the statutory caps—as a question of great public importance. *Florigrown II*, 2019 WL 4019919, at *1.

- 14 -

We accepted review and, for the reasons explained below, now quash the First District's decision.

## ANALYSIS

The Department urges us to answer the certified question in the negative and, beyond that, challenges almost every aspect of the trial court's order. Florigrown defends all aspects of the trial court's order, including its conclusion, not addressed by the First District, that certain provisions of section 381.986(8)(a) violate the constitutional prohibition against special laws granting privileges to private corporations. We are unpersuaded by Florigrown's defense of the trial court's order.

A temporary injunction is extraordinary relief that should be granted only when the party seeking the injunction has established four elements: (1) a substantial likelihood of success on the merits, (2) the unavailability of an adequate remedy at law, (3) irreparable harm absent entry of an injunction, and (4) that the injunction would serve the public interest. *Provident Mgmt. Corp. v. City of Treasure Island*, 796 So. 2d 481, 485 (Fla. 2001) (extraordinary relief); *Reform Party of Fla. v. Black*, 885 So. 2d 303, 305 (Fla. 2004) (elements of a claim for a temporary injunction). We review a trial

court's factual findings on these elements for competent, substantial evidence, and we review its legal conclusions de novo. *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1258, 1265 (Fla. 2017). To the extent the decision to enter a temporary injunction involves an exercise of discretion, we defer to the trial court unless it has abused its discretion. *See id.* at 1258.

In the analysis that follows, we explain our conclusion that Florigrown has failed to show a substantial likelihood of success on the merits of its constitutional challenges to section 381.986(8). We need not discuss the remaining elements of the temporary injunction test, because a movant's failure to establish any single element means that the injunction must be denied.

### Florigrown's Constitutional Claims

There are three claims at issue: (1) that section 381.986(8)'s vertical-integration requirement conflicts with the Amendment; (2) that section 381.986(8)'s caps on the number of MMTC licenses available conflicts with the Amendment; and (3) that three aspects of section 381.986(8)(a) violate Florida's constitutional prohibition against the use of a special law to grant a privilege to a private corporation.

All of these claims present issues of statutory or constitutional construction, which we review de novo, and, to the extent these texts are clear and unambiguous, we accord them their plain meaning without resort to external sources cited in support of a litigant's view of what the legislators or voters intended beyond that plain meaning. *Advisory Op. to Governor re Implementation of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070, 1078 (Fla. 2020); *Israel v. DeSantis*, 269 So. 3d 491, 495 (Fla. 2019). To the extent the claims involve issues of fact, we review the trial court's findings for competent, substantial evidence in the record. *St. Vincent's Med. Ctr., Inc. v. Mem'l Healthcare Grp., Inc.*, 967 So. 2d 794, 799 (Fla. 2007).

Additionally, our consideration of Florigrown's likelihood of success on the merits of these claims is guided by a few overarching considerations. First, article III, section 1 of the Florida Constitution vests "[t]he legislative power of the state" in the Legislature. Second, "[t]he Legislature may exercise any lawmaking power that is not forbidden by [the Constitution]," which means that, "unless legislation be clearly contrary to some express or necessarily implied prohibition found in the Constitution, the

courts are without authority to declare legislative acts invalid."
*Savage v. Bd. of Pub. Instr. for Hillsborough Cty.*, 133 So. 341, 344 (Fla. 1931). Third, "statutes are presumed constitutional, and the challenging party has the burden to establish the statute's invalidity beyond a reasonable doubt." *Jackson v. State*, 191 So. 3d 423, 426 (Fla. 2016). With these considerations in mind, we turn to Florigrown's constitutional challenges to section 381.986.

*Vertical Integration*

Florigrown argues, and the lower courts agreed, that Florigrown has a substantial likelihood of success on the merits of its claim that section 381.986(8)(e)'s vertical-integration requirement conflicts with the definition of "MMTC" provided in the Amendment. As noted earlier, the Amendment defines "MMTC" as "an entity that acquires, cultivates, possesses, processes . . . , transfers, transports, sells, distributes, dispenses, or administers marijuana, products containing marijuana, related supplies, or educational materials to qualifying patients or their caregivers and is registered by the Department." Art. X, § 29(b)(5), Fla. Const. In pertinent part, section 381.986(8)(e) provides as follows:

A licensed medical marijuana treatment center shall cultivate, process, transport, and dispense marijuana for medical use. A licensed medical marijuana treatment center may not contract for services directly related to the cultivation, processing, and dispensing of marijuana or marijuana delivery devices, except that a medical marijuana treatment center licensed pursuant to subparagraph (a)1. may contract with a single entity for the cultivation, processing, transporting, and dispensing of marijuana and marijuana delivery devices.

The trial court and the First District concluded that section 381.986(8)(e) modifies or restricts a right granted under the Amendment by requiring an MMTC to perform several specified functions in order to be licensed as an MMTC, whereas the constitution defines "MMTC" using a disjunctive list of those and other functions. We disagree. In reaching their conclusions, the trial court and the First District misconstrued the constitution by overlooking the context of the definition of "MMTC" provided in the Amendment and by failing to give due consideration to the authority that the Amendment, by its plain language and when considered together with article III, section 1 of the Florida Constitution, leaves to the Legislature in the establishment of policy related to MMTCs.

More specifically, Florigrown contends, and the lower courts found, that the Amendment's definition of "MMTC" conflicts with

- 19 -

the vertical-integration requirement.  Article X, section 29(b)(5) of the Florida Constitution provides a two-part definition of "MMTC." That definition, in itself, gives no entity the right to be either registered or licensed.  Under that definition, an entity is an MMTC if it "[1] acquires, cultivates, possesses, processes . . . , transfers, transports, sells, distributes, dispenses, or administers marijuana, products containing marijuana, related supplies, or educational materials to qualifying patients or their caregivers and [2] is registered by the Department."  Art. X, § 29(b)(5), Fla. Const.  Thus, an entity is an MMTC if it performs any one of the listed functions and is registered by the Department.  *Id.*  Section 381.986(8)(e) does not say otherwise.

In fact, section 381.986 does not undertake to define "MMTC" at all.  What it does is set forth requirements that an MMTC must meet in order to be licensed.  One of those requirements, the one pertinent here, is that the MMTC must "cultivate, process, transport, and dispense marijuana for medical use" and "may not contract for services directly related to the cultivation, processing, and dispensing of marijuana or marijuana delivery devices," with certain exceptions.  § 381.986(8)(e).  Because the Amendment

nowhere says that any entity that performs one of the listed functions is entitled to registration or licensure, the statute's requirement that an entity perform several of those functions to be licensed does not conflict with the Amendment.

Because there is no conflict between the MMTC definition and the statute's vertical-integration requirement, and the Amendment expressly left the Legislature its authority to "enact[] laws consistent with this section," art. X, § 29(e), Fla. Const., Florigrown's challenge to section 381.986(8)(e) does not have a substantial likelihood of success on the merits.

Additionally, to the extent Florigrown is arguing that the Legislature has no right to require licensure of MMTCs or that the Department is required to register MMTCs who do not qualify for licensure under the statute, we conclude that Florigrown does not have a substantial likelihood of success on the merits of this claim. Florigrown points out that the Amendment does not speak of "licensing" MMTCs but instead directs the "registering" of MMTCs. Art. X, § 29(d)(3), Fla. Const. However, this is not a conflict between the statute and the constitution but a difference in the chosen labels. It is clear from the Amendment that "registration" is

not simply putting an entity's name on a list as a business that performs one of the functions of an MMTC. The constitution directs the Department to promulgate "[p]rocedures for the registration of MMTCs that include procedures for the issuance, renewal, suspension, and revocation of registration, and standards to ensure proper security, record keeping, testing, labeling, inspection, and safety." Art. X, § 29(d)(1)c., Fla. Const. This language establishes that the right to register does not result directly from the constitutional definition of MMTC, but from regulations promulgated by the Department providing standards to be met. Notably, the constitutional definition of "MMTC" does not provide for unilateral registration "with" the Department; it requires an entity to be registered "by" the Department, according to regulations designed to ensure safety and security, before it can be considered an MMTC and entitled to immunity from state-law liability. Art. X, § 29(b)(5), (d)(1)c., Fla. Const.

While the Amendment uses the term "procedures" to refer to the regulations the Department must promulgate, the language describing the subject matter of those procedures—including "suspension and revocation of registration" and "standards to

- 22 -

ensure proper security, record keeping, testing, labeling, inspection, and safety"—indicates that the Amendment contemplates substantive standards to be imposed on entities seeking registration as MMTCs. *See* art. X, § 29(d)(1)c., Fla. Const. Thus, the registration the Amendment speaks of operates as a license. Indeed, this Court understood this language to refer to licensure when it reviewed the Amendment for placement on the ballot as a citizen initiative. *See In re Adv. Op. to Att'y Gen. re Use of Marijuana for Debilitating Med. Conditions*, 181 So. 3d 471, 477 (Fla. 2015).

In sum, the Amendment defines "MMTC" by reference to its "regist[ration] by the Department," requires the Department to promulgate substantive regulations for both the issuance and potential revocation of such "registration," and further, expressly recognizes the Legislature's authority to "enact[] laws consistent with this section." Art. X, § 29(e), Fla. Const. Because the Amendment does not entitle an entity to either registration or licensure simply because it intends to perform one of the listed functions, and the Amendment contemplates licensure according to substantive standards, the Legislature's enactment of standards that include vertical integration is not inconsistent with the

Amendment. Accordingly, the vertical-integration requirement of section 381.986(8)(e) is within the Legislature's specific authority recognized in article X, section 29(e) and its plenary lawmaking authority set out in article III, section 1 of the Florida Constitution. Florigrown does not have a substantial likelihood of success on the merits of its challenge to the statute's vertical-integration requirement for licensure as an MMTC.

*Statutory Caps on the Number of Licenses*

As for the statutory caps set out in section 381.986(8)(a), Florigrown argues, and the lower courts agreed, that Florigrown has a substantial likelihood of success on the merits of its claim that these caps violate the Amendment by placing an unreasonable restriction on the medical marijuana industry and conflicting with the Amendment's purpose of "ensur[ing] the availability and safe use of medical marijuana by qualifying patients." Art. X, § 29(d), Fla. Const. These rulings are not based on a direct conflict between any constitutional language and the statute. They are based partly on a factual finding that the statutory caps have made medical marijuana unavailable, or insufficiently available, in this state and partly on a legal conclusion that the statutory caps are

unreasonable in light of the Amendment's purpose. We disapprove of these rulings because competent, substantial evidence does not support a finding that the statute has made medical marijuana unavailable, and the Amendment does not preclude a limit on the number of MMTCs that can be licensed.[2]

To assess Florigrown's argument and the lower courts' rulings, we first review and explain the statutory caps. Under section 381.986(8)(a), the Department was required to issue a limited number of licenses between the date of the statute's enactment in June 2017 and October 1, 2017, and is required, on a continuing basis, to issue additional licenses as the number of registered qualifying patients increases. § 381.986(8)(a)1.-4. Specifically, section 381.986(8)(a) provides for the issuance of licenses to all existing dispensing organizations plus ten other entities and further provides for an expanding number of licenses, in increments of four per 100,000 qualifying patients. § 381.986(8)(a)1.-4.

---

2. Florigrown concedes that the Legislature has the authority to impose a cap but argues that the chosen cap is unreasonable, without providing any standard for this Court to determine what would be reasonable under the Amendment's language.

When the trial court issued the temporary injunction in this case, fourteen entities had been licensed as MMTCs, at least seven more licenses were to become available upon completion of ongoing rulemaking, and the statute provided for even more licenses to become available as the patient population increased. When enacted, the statute limited the number of dispensing facilities each entity could operate, providing a limit of twenty-five per MMTC and a limit within that twenty-five of how many dispensing facilities each MMTC could operate in each of five regions of the state. § 381.986(8)(a)5.a. However, the statute provided for an expanding number of facilities in increments of five additional facilities per MMTC each time the patient population reached an additional 100,000 patients. *Id.* Further, as planned from the outset by the terms of the statute, the limitation on the number of dispensing facilities MMTCs are permitted to operate expired on April 1, 2020. § 381.986(8)(a)5.d. There is now no limit. *Id.*

In addition to operating an unlimited number of dispensing facilities as of April 1, 2020, MMTCs are permitted to deliver medical marijuana to qualifying patients. § 381.986(8)(g). There also is no limit, and there has not been a limit, on the size of a

dispensing facility or on the amount of medical marijuana each MMTC may produce and sell.

Given the provision in the statute for at least twenty-one vertically integrated MMTCs—the fourteen that were licensed at the time of the trial court's decision and the seven others that could become licensed upon completion of rulemaking—and the statutorily planned expansion of that number in proportion to an increase in the patient population, with no limit on the amount of marijuana that can be produced and sold per MMTC, the trial court's finding that the statute violates the Amendment by making medical marijuana essentially unavailable in the state is inconsistent with the language of the statute. It also lacks record support.

In an attempt to support the ruling, Florigrown points out sixteen affidavits it submitted to the trial court, in which qualifying patients attested to difficulties in finding the products they need, high prices when they do find the products they need, and lack of knowledge and professionalism in MMTC employees they have dealt with. These affidavits are not competent, substantial evidence that medical marijuana is not available in this state, even when viewed

in light of testimony by Florigrown's witnesses that the troubles revealed in these affidavits are consistent with what they have seen in other vertically integrated markets. These affidavits and this testimony would support a finding that Florida's fledgling medical marijuana market is not functioning seamlessly, but not that the statute renders medical marijuana essentially unavailable for safe use in this state.

Florigrown also asserts, as support for the trial court's finding, that the Department has found that Florida needs 1,993 MMTCs to serve its population of qualifying patients. However, Florigrown has taken this number out of context. This number was calculated by the Department before the Amendment became effective and before section 381.986 created a vertically integrated market, and it was calculated for the purpose of estimating the costs of implementing the Amendment. The Department arrived at this figure based on an extrapolation from the number of facilities operating in Colorado's horizontal medical marijuana market, and in reaching this figure, the Department assumed a total patient population in Florida of 440,552. In contrast, at the time of the hearing conducted on

Florigrown's motion for a temporary injunction, the registry of qualified patients had just crossed the 100,000-patient threshold.

Furthermore, the number 1,993 is not the Department's determination of the minimum number of facilities the state must have to adequately serve the needs of qualifying patients, but of the number of facilities the Department expected the state to have after implementation of the Amendment based on Colorado's experience with medical marijuana. For these reasons, the out-of-context number emphasized by Florigrown does not support its claim that the statute was making medical marijuana essentially unavailable at the time of the trial court's order. And, in any event, because the statute's limitation on the number of dispensing facilities that each MMTC could operate has now expired, any claim that medical marijuana is somehow unavailable because the state does not have 1,993 facilities is even less supportable. Florigrown has not shown that the statute precludes the opening of a sufficient number of facilities to meet the demands of the population of qualifying patients.

Finally, Florigrown and its amici curiae assert that many current MMTC licensees are not producing medical marijuana and

that others have sold their licenses for exorbitant amounts of money, some without having produced or sold any marijuana. However, Florigrown has not argued that there is a constitutional infirmity in the statute's allowance for the sale of licenses, and any lack of production is the result of failure or inaction by the licensees, not a statutory block to production or distribution of marijuana.

For these reasons, we conclude that Florigrown does not have a substantial likelihood of success on the merits of its challenge to the statutory caps.

*Special-Law Challenge*

Florigrown's last claim on the merits is that subparagraph 1, sub-subparagraph 2.a, and subparagraph 3 of section 381.986(8)(a) are unconstitutional under article III, section 11(a)(12) of the Florida Constitution because they are special laws granting privileges to private corporations. The trial court found that Florigrown has a substantial likelihood of success on the merits of these claims. Again, we disagree.

The statutory provisions that Florigrown challenges as special laws granting privileges to private corporations are the following:

1. As soon as practicable, but no later than July 3, 2017, the department shall license as a medical marijuana treatment center any entity that holds an active, unrestricted license to cultivate, process, transport, and dispense low-THC cannabis, medical cannabis, and cannabis delivery devices, under former s. 381.986, Florida Statutes 2016, before July 1, 2017, and which meets the requirements of this section. . . .

2. The department shall license as medical marijuana treatment centers 10 applicants that meet the requirements of this section, under the following parameters:

a. As soon as practicable, but no later than August 1, 2017, the department shall license any applicant whose application was reviewed, evaluated, and scored by the department and which was denied a dispensing organization license by the department under former s. 381.986, Florida Statutes 2014; which had one or more administrative or judicial challenges pending as of January 1, 2017, or had a final ranking within one point of the highest final ranking in its region under former s. 381.986, Florida Statutes 2014; which meets the requirements of this section; and which provides documentation to the department that it has the existing infrastructure and technical and technological ability to begin cultivating marijuana within 30 days after registration as a medical marijuana treatment center.
. . . .
c. As soon as practicable, but no later than October 3, 2017, the department shall license applicants that meet the requirements of this section in sufficient numbers to result in 10 total licenses issued under this subparagraph, while accounting for the number of licenses issued under sub-subparagraphs a. and b.

3. For up to two of the licenses issued under subparagraph 2., the department shall give preference to

applicants that demonstrate in their applications that they own one or more facilities that are, or were, used for the canning, concentrating, or otherwise processing of citrus fruit or citrus molasses and will use or convert the facility or facilities for the processing of marijuana.

§ 381.986(8)(a).

Article III, section 11(a)(12) of the Florida Constitution provides that "[t]here shall be no special law or general law of local application pertaining to . . . private incorporation or grant of privilege to a private corporation." Thus, to violate this provision, a statute must have two features: (1) it must be either a special law or a general law of local application, and (2) it must grant a privilege to a private corporation. We conclude that the challenged provisions are parts of a general law implementing a statewide regulatory scheme and, accordingly, do not violate article III, section 11(a)(12) of the Florida Constitution.

The Florida Constitution defines "special law" as "a special or local law." Art. X, § 12(g), Fla. Const. A "special law" is "one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal." *State ex rel. Landis v. Harris,* 163 So. 237, 240

(Fla. 1934) (citation omitted). Additionally, in consideration of the constitutional requirement that a special law not be passed without either notice or a referendum, *see* art. III, § 10, Fla. Const., this Court has made the following observation:

> The terms "special or local laws" as used in the Constitution refer ordinarily to law relating to entities, interests, rights, and functions other than those of the State since the organic law does not contemplate or require previous publication of notice of proposed laws for the exercise of State powers and functions though they may be more or less local or special in their operations or objects.

*State ex rel. Gray v. Stoutamire*, 179 So. 730, 733 (Fla. 1938).

A law that addresses state interests and operates to protect those interests using valid classifications "based upon proper differences which are inherent in or peculiar to the class[es]" is a general law. *Schrader v. Fla. Keys Aqueduct Auth.*, 840 So. 2d 1050, 1055 (Fla. 2003) (citing *Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc.*, 434 So. 2d 879, 881 (Fla. 1983)); *see also Fla. Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n, Inc.*, 967 So. 2d 802, 806 (Fla. 2007). Even if the law is limited in direct application, it is still a general law as long as the limitation on its application bears a reasonable relationship to its

statewide purpose. *See R.J. Reynolds Tobacco Co. v. Hall*, 67 So. 3d 1084, 1090-92 (Fla. 1st DCA 2011) (finding a law general where it applied to five tobacco companies in such a way as to protect funds used for statewide programs). The law at issue here appears to satisfy these criteria, and Florigrown has no substantial likelihood of proving otherwise.

Florigrown contends that the challenged provisions constitute special laws because they operate on closed classes. Indeed, we have often held that the closed nature of a class affected by a particular law indicated that the law was special. *E.g.*, *Ocala Breeders' Sales Co. v. Fla. Gaming Ctrs., Inc.*, 793 So. 2d 899, 901 (Fla. 2001) (holding that a statute was a special law because it "created an impenetrable barrier to all intertrack wagering applicants except [one]"); *Dep't of Bus. Regulation v. Classic Mile, Inc.*, 541 So. 2d 1155, 1159 (Fla. 1989) ("In determining if a reasonable relationship exists [between the statute's purpose and the classification it uses], '[t]he fact that matters is that the classification is potentially open to other tracks.' " (quoting *Sanford-Orlando Kennel Club*, 434 So. 2d at 882). However, we have not held that every statute operating on a closed class constitutes a

special law. *See, e.g., Schrader*, 840 So. 2d at 1056 (upholding a law that operated only in Monroe County but served to protect a "vital natural resource" of the entire state); *State v. Fla. State Turnpike Auth.*, 80 So. 2d 337, 343-44 (Fla. 1955) (upholding as general a law establishing the Florida State Turnpike Authority).

Regardless, we conclude that the statute at issue creates an open class of entities that may be eligible for MMTC licensure and, within that open class, creates subclassifications "based upon proper distinctions and differences that inhere in or are peculiar or appropriate to the class," *Sanford-Orlando Kennel Club*, 434 So. 2d at 881, making it a general law. Florigrown's contrary argument is based on a myopic view of the subparagraphs and sub-subparagraph that it pulls out of the entire statutory scheme and fails to read the statute as a whole.

Read as a whole, and in light of the constitutional imperative for medical marijuana to be made available in a safe manner within nine months, the statute creates a licensure scheme designed to ensure regulated access to medical marijuana throughout the state within a short time frame, as contemplated by the Amendment. *See* art. X, § 29(d)(2), Fla. Const. (requiring the Department to begin

registering MMTCS and issuing patient and caregiver identification cards within nine months).  The statute does so by giving essentially immediate licensure to each licensed dispensing organization—which are spread across five regions encompassing the entire state—as long as those entities meet the current statutory criteria governing MMTCs.  § 381.986(8)(a)1. (requiring licensure of dispensing organizations that meet the statutory criteria); § 381.986(5)(b), Fla. Stat. (2014) (requiring the Department to authorize the establishment of one dispensing organization in each of five regions in the state, consisting of the northwest, northeast, central, southeast, and southwest).  Those licenses had to be issued by July 3, 2017.  § 381.986(8)(a)1.  The statute also required the licensure by August 1, 2017, of certain other entities that had already been through the application process for becoming dispensing organizations—as long as those entities met the statutory criteria governing MMTCs and provided "documentation . . . that [they had] the existing infrastructure and technical and technological ability to begin cultivating marijuana within 30 days after registration."  § 381.986(8)(a)2.a.  These provisions essentially

"grandfather" the dispensing organizations and prior applicants into the current licensure scheme.

This grandfathering is accomplished with valid classifications that bear a "reasonable relation to the subject matter" of the statute. *See Sanford-Orlando Kennel Club*, 434 So. 2d at 881. Namely, these classifications describe entities that had already been engaged in, or had made a substantial effort to be engaged in, the pre-Amendment medical marijuana industry in Florida. They were applicants who were more likely than most to be prepared to join the industry efficiently, and they were applicants the Department was already familiar with.

The grandfathering provisions of section 381.986(8) are analogous to the statute upheld as a general law in *St. Johns River Water Management District v. Deseret Ranches of Florida, Inc.*, 421 So. 2d 1067, 1069 (Fla. 1982). That statute, read in isolation, applied to a limited geographical area of the state. *Id.* at 1067-68. It was nevertheless a general law because it was one part of a statewide system of water management contained within the Florida Statutes. *Id.* at 1068-69. Thus, focusing on one statute within a chapter of the Florida Statutes addressing a comprehensive

legislative scheme was an improper approach to the question of whether a law was special or general. *See id.*

Similarly, when analyzing whether a law is special or general, it is improper to isolate subparagraphs of a statutory section embodying a broad regulatory scheme. The provisions of section 381.986 requiring the MMTC licensure of all dispensing organizations and certain prior applicants for dispensing-organization licensure—specifically, subparagraph (a)1. and sub-subparagraph (a)2.a.—are components of a statewide system of medical-marijuana management. As in *St. Johns River Water Management District*, those provisions, though limited in direct application, "materially affect[] the people of the state" as part of a comprehensive approach to a statewide concern. 421 So. 2d at 1069.

Importantly, the statute as a whole does not limit MMTC licensure to the applicants that were eligible to receive licensure by July and August of 2017 based on their participation in the process for becoming dispensing organizations. Section 381.986(8)(a)2.c. provides for licensure by October 3, 2017, of additional applicants beyond those that participated in the prior process, until a total of

ten licenses have been issued under section 381.986(8)(a)2., including those issued to prior dispensing-organization applicants and another group identified in section 381.986(8)(a)2.b., which is not at issue in this proceeding. In addition, any other entity that wishes to apply for a license in the future may do so, and may potentially receive one, as the number of available licenses expands under section 381.986(8)(a)4. to meet the needs of the state.

All future licensees will receive licenses equal to the ones initially issued during this early stage of Florida's medical marijuana industry. The fact that other entities may join the class of licensed MMTCs in the future as circumstances in the state change means that the class is open and the law general. *Cf. City of Coral Gables v. Crandon*, 25 So. 2d 1, 2-3 (Fla. 1946) (holding that a law was not special where it was applicable to only one county when it was enacted but where other counties were expected to meet the criteria to join the class in the future); *Classic Mile*, 541 So. 2d at 1158 n.4 (finding a law special because its "classification scheme . . . [was] fixed so as to preclude additional parties from satisfying the requirements for inclusion within the statutory classification at some future point in time").

Thus far in our special-law analysis, we have addressed only two of the three challenged provisions. In addition to challenging the grandfathering provisions of section 381.986(8)(a)1. and 2.a., Florigrown challenges section 381.986(8)(a)3., which provides a licensure preference to an open class of entities that intend to convert a citrus-processing facility into a marijuana-processing facility. The basis for this classification in relation to the purpose of the statute is unclear. However, even assuming (without deciding) that this portion of the statute does not operate on a valid classification and that its existence within a broader scheme allowing the licensure of an ever-expanding open class does not defeat Florigrown's challenge, we conclude that this subclassification itself is open. This provision does not appear to be limited to entities who owned citrus facilities at the time of the statute's enactment, and we are aware of no reason to conclude that, even though the class is technically open, it applies to and was designed to apply to a narrow set of entities for no reason rationally related to the statute's purpose. *Cf. Knight v. Bd. of Pub. Instr. for Hillsborough Cty.*, 136 So. 631, 631 (Fla. 1931). Therefore, we have no reason to believe this portion of the statute, even if

properly viewed in isolation, is a special law enacted in the guise of a general law.[3]

For the foregoing reasons, we hold that Florigrown does not have a substantial likelihood of success on the merits of its constitutional challenge to section 381.986(8)(a)1, 2.a., and 3. as special laws granting privileges to private corporations in violation of article III, section 11(a)(12) of the Florida Constitution.

**CONCLUSION**

Florigrown does not have a substantial likelihood of success on the merits of its constitutional challenges to section 381.986(8). Accordingly, Florigrown's request for a temporary injunction should have been denied. We quash the First District's decision and remand this case to the First District with instructions to further remand to the trial court for vacation of the temporary injunction.

---

3. We understand that the citrus preference is the subject of separate litigation. Accordingly, we note that this opinion is not intended to announce a final conclusion on whether the citrus preference is an invalid special law or has any other constitutional infirmities. Our conclusions as to the citrus preference, like all of our conclusions on the merits of Florigrown's claims, should be understood as limited to the point that Florigrown has not established a substantial likelihood of success on the merits of its claims, based on the arguments and evidence presented in this proceeding.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LAWSON, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring in part and dissenting in part.

I agree with the majority's conclusions that Florigrown has not demonstrated a substantial likelihood of success on the merits as to its arguments (1) that section 381.986(8)'s vertical-integration requirement conflicts with the 2016 medical marijuana amendment added to the Florida Constitution as article X, section 29 (the Amendment); and (2) that section 381.986(8)'s caps on the number of MMTC licenses available conflicts with the Amendment. Unlike the majority, however, I conclude that Florigrown has demonstrated a substantial likelihood of success on the merits of its challenge to section 381.986(8)(a)1. and 2.a. as special laws granting privileges to private corporations in violation of article III, section 11(a)(12) of the Florida Constitution.

As stated by the majority, a violation of article III, section 11(a)(12) has two components: (1) the law is a special law or a

- 42 -

general law of local application; and (2) the law grants a privilege to a private corporation. The latter inquiry is straightforward in this case. A privilege is a "right," "benefit," or "advantage." *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 512 (Fla. 2008). The provisions in question, section 381.986(8)(a)1. and 2.a., grant certain private corporations—described so precisely that they might as well be named in the statute—the right to MMTC licensure without entering the competition that others must enter for a statutorily capped number of licenses. Because the law grants this clear benefit to these private corporations, it violates the Florida Constitution unless it can be properly construed as a general law.

Our case law firmly establishes that, with limited exceptions not applicable here but discussed below, a statute that operates on a closed class is a special law. *Fla. Dep't of Bus. & Prof'l Reg. v. Gulfstream Park Racing Ass'n, Inc.*, 967 So. 2d 802, 809 (Fla. 2007) (recognizing that a statute prohibiting intertrack wagering by certain pari-mutuel wagering permitholders applied the prohibition based on conditions that had no reasonable possibility of ever applying outside a small, specific area of the state and that, as a result, the statute was a special law); *St. Vincent's Med. Ctr., Inc. v.*

*Mem'l Healthcare Grp., Inc.*, 967 So. 2d 794, 802 (Fla. 2007) (holding that a statute providing an exemption for hospitals meeting certain criteria was a special law because it applied to only one hospital and could not reasonably be expected to apply to others in the future); *Ocala Breeders' Sales Co. v. Fla. Gaming Ctrs., Inc.*, 793 So. 2d 899, 901 (Fla. 2001) (holding that a statute was a special law because it "created an impenetrable barrier to all intertrack wagering applicants except [one]"); *Dep't of Bus. Reg. v. Classic Mile, Inc.*, 541 So. 2d 1155, 1159 (Fla. 1989) ("In determining if a reasonable relationship exists [between the statute's purpose and the classification it uses], '[t]he fact that matters is that the classification is potentially open to other tracks.' " (quoting *Dep't of Legal Affairs v. Sanford-Orlando Kennel Club, Inc.*, 434 So. 2d 879, 882 (Fla. 1983)); *cf. City of Coral Gables v. Crandon*, 25 So. 2d 1, 2-3 (Fla. 1946) (holding that a statute that applied to any county with a population greater than 260,000 was not a special law even though it applied to only one county at the time of enactment, where other counties were rapidly approaching that population size). This clear principle of law makes sense.

The use of a closed class in a statute is "no different" from identifying the entities to which it applies by name, and that makes the statute a special law under a definition this Court has used since at least the early 20th century, in that the law "relate[s] to, or [is] designed to operate upon, particular persons or things." *City of Miami v. McGrath*, 824 So. 2d 143, 148 (Fla. 2002) (quoting *State ex rel. Landis v. Harris*, 163 So. 237, 240 (Fla. 1934)). There has been no request for us to reconsider this precedent, and the majority does not say it is doing so. Indeed, this precedent is firmly embedded in our law, existing as it has for almost a century, even while the constitution has undergone numerous revisions without any that undermine this understanding of what a special law is. *Cf. City of Hollywood v. Lombardi*, 770 So. 2d 1196, 1202 (Fla. 2000) (explaining that, when adopting a new version of a law, the Legislature is presumed to know the prior judicial constructions of it and to have adopted those constructions unless a contrary intention is expressed).

Neither the claimed existence of a reasonable relation between the statute's purpose and the closed class nor the operation of the broader statute throughout the state is sufficient in itself to change

- 45 -

the character of a statute from special to general when the statute operates on a closed class. *See Classic Mile*, 541 So. 2d at 1159 (explaining that the "fact that matters" in determining whether a reasonable relationship exists and, thus, whether the law is a special law is whether it creates an open or a closed class) (quoting *Sanford-Orlando*, 434 So. 2d at 882). Nor is the combination of these two attributes. And, neither any participant in this case nor the majority has cited any precedent of this Court to the contrary.

When this Court has discussed the reasonable relationship between a classification and the purpose of a statute, it has done so in the context of statutes that created open classifications. For example, this Court has relied on the reasonable relationship, or lack thereof, between a classification and the purpose of a statute to show why a statute constituted a special law despite the theoretical openness of its classification scheme. *Knight v. Bd. of Pub. Instruction for Hillsborough Cnty.*, 136 So. 631, 631-32 (Fla. 1931). This Court has also cited the reasonable relation between an open classification and the purpose of a statute to support the point that a statute was a general law. *See Sanford-Orlando*, 434 So. 2d at 881-82 (holding, after finding that a reasonable relationship existed

between the classification in the statute and the classification it adopted, that the "controlling point" driving this Court's determination that the statute at issue was not a special law was that the classification at issue was "open and ha[d] the potential of applying to other[s]"); *Biscayne Kennel Club, Inc. v. Fla. State Racing Comm'n*, 165 So. 2d 762, 763 (Fla. 1964) (holding that an act granting licenses for harness racing was a general law "[b]ecause all of the classifications effected by this act [were] made on the basis of factors which [were] potentially applicable to others and which [were] not purely arbitrary in relation to the subject regulated or the conduct authorized"). However, I am aware of no case in which this Court has held that a statute using a closed class of private entities can be saved from a determination that it is a special law simply because the classification scheme is reasonable in relation to the statute's purpose.[4]

---

4. The First District reached such a holding in *R.J. Reynolds Tobacco Co. v. Hall*, 67 So. 3d 1084 (Fla. 1st DCA 2011), but in so doing, the First District ignored that the statute gave a benefit to a closed class, focusing instead on a separate, open class, affected by the statute.

Such a holding would nullify the constitutional prohibition against enacting special laws without following the specific procedural requirements applicable to them, *see* art. III, § 10, Fla. Const., because the Legislature is already independently precluded from creating arbitrary classifications, as a matter of equal protection, *see Jackson v. State*, 191 So. 3d 423, 426 (Fla. 2016). This Court's precedent instructs that a classification generally must be both open and reasonable in relation to the statute's purpose for the law to be considered general. *See Sanford-Orlando*, 434 So. 2d at 881-82; *Biscayne Kennel Club*, 165 So. 2d at 764; *see also License Acquisitions, LLC v. DeBary Real Estate Holdings, LLC*, 155 So. 3d 1137, 1143 (Fla. 2014). The exception to this rule exists in cases addressing statutes that perform essential state functions and operate on the basis of closed classes of public property or geographic locations in such a way as to have a statewide effect. *See, e.g., Schrader v. Fla. Keys Aqueduct Auth.*, 840 So. 2d 1050, 1056 (Fla. 2003) (statute protecting nearshore waters of the Florida Keys); *St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Fla., Inc.*, 421 So. 2d 1067, 1069 (Fla. 1982) (statute creating a water management district as part of a comprehensive scheme); *State v.*

*Fla. State Turnpike Auth.*, 80 So. 2d 337, 343-44 (Fla. 1955) (statute creating the Florida State Turnpike Authority to establish the turnpike in a limited geographic area); *Cantwell v. St. Petersburg Port Auth.*, 21 So. 2d 139, 140 (Fla. 1945) (statute authorizing the Railroad Commission to grant franchises for the construction of bridges and operation of ferries and similar enterprises for travel over and through waters connected to the Gulf of Mexico).

We have explained that a law is a general law despite its limited direct application if it pertains to state property, such as state buildings, lands, funds, and other "absolute property." *State ex rel. Gray v. Stoutamire*, 179 So. 730, 733 (Fla. 1938). And, we have expressly recognized the following rule pertaining to cases involving the protection of vital natural resources or the construction of basic infrastructure affecting travel and tourism throughout the state: "[I]f a law utilizes a classification that is geographical in its terms but the purpose of the statute is one of statewide importance and impact, and the classification is reasonably related to the law's purpose, it is a valid general law." *Schrader*, 840 So. 2d at 1056; *see Fla. State Turnpike Auth.*, 80 So. 2d at 343-44; *Cantwell*, 21 So. 2d at 140. The reason such laws are

general even though they operate on closed classes is that the closed classes themselves consist of aspects of the very fabric of the state, not "particular persons or things." *Landis*, 163 So. at 240.

Private corporations that produce and sell medical marijuana are not aspects of the fabric of the state. They are not property of the state, and they do not individually execute functions that naturally affect the entirety of the state. Therefore, a law operating on a closed class of private corporations in the context of a medical marijuana regulation is a special law. *Cf. Classic Mile*, 541 So. 2d at 1159 (rejecting the argument that a pari-mutuel wagering statute was general despite its use of a closed class extending to a single county because it was "part of the overall statewide regulatory scheme for the parimutuel industry" and would generate revenue for the state); *St. Vincent's Med. Ctr.*, 967 So. 2d at 801-02 (holding that a law granting a licensure exemption to a hospital was a special law because it applied to a closed class of one hospital).

Plainly, this statute contains provisions—section 381.986(8)(a)1. and 2.a.—that apply only to closed classes. That the statute, through section 381.986(8)(a)2.c. and 4., also creates a separate class of applicants that is open and may compete for the

licenses designated for that class does not change the analysis of whether the provisions guaranteeing licenses to particular entities without competition are special laws. The majority's holding to the contrary renders article III, section 11(a)(12) of the Florida Constitution ineffective as the limitation on legislative power that it is. Under the majority's holding, the Legislature can avoid the prohibition against granting a privilege to a private corporation through a special law by simply pairing any effort to do so with an open, even contingent, class. *See DeBary Real Estate Holdings, LLC v. State Dep't of Bus. & Prof'l Regulation*, 112 So. 3d 157, 165 (Fla. 1st DCA 2013), *rev'd on other grounds sub nom. License Acquisitions v. Debary Real Estate Holdings*, 155 So. 3d 1137, 1143-5 (Fla. 2014). We should not cast article III, section 11(a)(12) aside and ignore the closed class contained within the broader scheme of section 381.986(8).

In addition, I note that the Department claimed at oral argument that the class is not closed because any entity can sell its license once the license is obtained. The idea is that anyone can effectively join the classes established by section 381.986(8)(a)1. and 2.a. by purchasing a license from one of the entities that

- 51 -

obtained their licenses under those provisions.  This argument, of course, does not show that the classes created by section 381.986(8)(a)1. and 2.a. are open.  It only underscores that the privilege those classes have been granted—access to a limited number of licenses to sell an unlimited amount of marijuana—is a valuable commodity.

In sum, I conclude that Florigrown has a substantial likelihood of success on the merits of its claims that section 381.986(8)(a)1. and 2.a. constitute special laws.  It is undisputed that these provisions give specific, identifiable entities who participated in the dispensing organization application process the opportunity for licensure without competition and that no other entities can qualify for the licenses designated for these entities. Therefore, Florigrown is likely to succeed on its claim that these provisions are invalid as special laws, enacted in the guise of a general law, that grant privileges to private corporations.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

First District - Case No. 1D18-4471

(Leon County)

Colleen Ernst, Executive Office of the Governor, Tallahassee, Florida; Louise Wilhite-St. Laurent, Florida Department of Health, Tallahassee, Florida; and Jason Gonzalez, Daniel Nordby, Amber Nunnally, and Rachel Procaccini of Shutts & Bowen LLP, Tallahassee, Florida,

for Petitioner

Katherine E. Giddings, Tallahassee, Florida, Jonathan S. Robbins, Fort Lauderdale, Florida, and Ari H. Gerstin of Akerman LLP, Miami, Florida,

for Respondent

John M. Lockwood, Thomas J. Morton, and Devon Nunneley of The Lockwood Law Firm, Tallahassee, Florida; James A. McKee of Foley & Lardner LLP, Tallahassee, Florida; and William D. Hall III and Daniel R. Russell of Dean Mead & Dunbar, Tallahassee, Florida,

Amici Curiae DFMMJ Investments, LLC, d/b/a Liberty Health Sciences and Acreage Florida, Inc., Perkins Nursery, Inc., San Felasco Nurseries, Inc. d/b/a Harvest, Mount Dora Farms, LLC, and Better - Gro Companies, LLC, d/b/a Columbia Care Florida, and Dewar Nurseries, Inc.

Mohammad O. Jazil of Hopping Green & Sams, P.A., Tallahassee, Florida; and Daniel William Bell, General Counsel, Florida House of Representatives, Tallahassee, Florida,

Amicus Curiae The Florida House of Representatives

Seann M. Frazier, Marc Ito, and Kristen Bond of Parker, Hudson, Rainer & Dobbs, LLP, Tallahassee, Florida,

Amicus Curiae Louis Del Favero Orchids, Inc.

Karl E. Pearson and Courtney M. Crossland of Pearson Doyle Mohre & Pastis LLP, Maitland, Florida,

Amicus Curiae Liner Source, Inc.

Jeff Kottkamp of Jeff Kottkamp, P.A., Tallahassee, Florida,

Amicus Curiae Triangle Capital, Inc.